935 F.2d 270
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Donald F. ROSINSKI, Plaintiff-Appellant,
v.
ELECTRONIC DATA SYSTEMS CORP., Defendant-Appellee.
 No. 90-2133.
 United States Court of Appeals, Sixth Circuit.
 June 18, 1991.
 
 Before RALPH B. GUY, JR. and DAVID A. NELSON, Circuit Judges, and HIGGINS, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff, Donald Rosinski, appeals from a summary judgment granted to the defendant, Electronic Data Systems Corporation (EDS), in this wrongful discharge case. The district court determined that Rosinski's employment was at will and that EDS was therefore entitled to judgment as a matter of law on plaintiff's claim that his termination without cause violated his employment contract. Plaintiff argues on appeal that defendant's express representations concerning job security, as well as company policies and procedures regarding employment termination, create genuinely disputed issues as to whether Rosinski could be terminated only for just cause. We affirm the district court for the reasons set forth below.
 
 I.
 
 2
 Plaintiff commenced employment with General Motors Corporation (GM) in 1962. After GM acquired EDS as a subsidiary in 1984, Rosinski and many other GM employees voluntarily transferred from GM to employment with EDS pursuant to a plan between the companies to have EDS assume GM's data processing activities.
 
 
 3
 Rosinski was offered a transition job with EDS by George Simenton, a GM transferee himself and plaintiff's former supervisor at GM. In his deposition testimony, Rosinski stated that he made the transition because "job opportunities were there and it looked like a good career move." (App. 628). "[A] motivating factor for" the transition, according to Rosinski, was the prospect that people in his position might later be subject to mandatory transfer anyway, and that by waiting he could lose the opportunity to participate in a stock incentive plan that was available to those who transferred sooner. (App. 156). Plaintiff participated in the stock incentive plan, which required him to sign a restricted stock agreement that included, in an appended prospectus, the following language:
 
 
 4
 12. No Effect on Employment. Nothing herein contained, including the sale or award of any shares and the grant of any rights or options, shall affect the rights of the Company to terminate any participant's employment at any time for any reason.
 
 
 5
 (App. 312).
 
 
 6
 Rosinski further testified that he was concerned about the level of job security he would receive at EDS, and that he expressed these concerns to Simenton. According to Rosinski, Simenton gave verbal assurance that "the job situation would be stable and good if they did their work properly." (App. 630). Simenton assured Rosinski that if there were problems with Rosinski's performance there would be a "mechanism" by which he could improve his work (app. 630), and Simenton also stated that he did not anticipate any layoffs because EDS was generally in a growth mode. (App. 638). According to Rosinski, Simenton informed him of an appraisal process and briefly reviewed the highlights of a six-step procedure[1] that "would be available to any person who had a potential problem" learning their job responsibilities.[2] (App. 147, 149). Plaintiff eventually bolstered his testimony describing Simenton's assurances by filing an affidavit in response to defendant's motion for summary judgment, wherein Rosinski stated that "Mr. Simenton assured me EDS does not dismiss employees without cause." In this affidavit, Rosinski also asserts that Simenton assured Rosinski that the six-step procedure for addressing poor work performance was a "mandatory progressive disciplinary procedure." (App. 693).
 
 
 7
 In addition to oral assurances, plaintiff relies upon the following written assurances of job security in literature provided to GM employees making the transition to EDS:
 
 
 8
 The purchase of Electronic Data Systems (EDS) by General Motors Corporation is part of General Motors commitment to all employees that it will continue to be a leader of industry and provide all employees with job security and potential growth....
 
 
 9
 ("Policies Applicable to Eligible GM Employees Transferring to EDS Effective January 1, 1985") (App. 650).
 
 
 10
 There is great job security at EDS because of its annual and profitable growth rate of approximately 25 percent, which provides us with an expanding customer base. This creates large and diverse opportunities. Also, EDS has never had a layoff of employees.
 
 
 11
 ... [T]here are no "losses" of COLA, overtime, shift premium, holidays, "layoff" benefits, job security, etc.
 
 
 12
 ("In Sync," and EDS newsletter.) (App. 738, 655).
 
 
 13
 Despite the foregoing representations, Rosinski told Simenton that job security remained a concern of his. (App. 648). Nevertheless, plaintiff made the transition to EDS by taking employment as an engineering consultant in EDS's "GM Coordinating Group," which served as a liaison between GM and EDS. When EDS decided to phase out the liaison program in December 1985, plaintiff began to search for new employment both within GM and EDS. In March 1986, Rosinski accepted a position as an account manager with EDS's Buick Oldsmobile Cadillac Headquarters Group (BOC). Although Rosinski had no background in account management and would face new financial management responsibilities, he chose to take the job, in part because he wanted to get a feel for the business end of things. Interviewing candidates for employment with EDS and maintaining a profitable account were included among his new responsibilities.
 
 
 14
 Pursuant to taking the management position, Rosinski participated in a training course for managers at EDS where he received written materials that he contends set forth EDS's employment policies, practices, and procedures, including the "Six-Step Method" for implementing discipline prior to terminating any employee for unsatisfactory work performance. Plaintiff relies upon numerous excerpts from these materials as giving rise to a legitimate expectation that EDS's policies, practices, and procedures created a contract to terminate only for just cause. The primary EDS publications at issue are Managing People and Leading People, and plaintiff cites numerous excerpts from these publications that relate only to general management principles and do not address employment termination.[3] In addition, plaintiff cites the following passages from Managing People that specifically address employment termination:
 
 
 15
 Beyond the unpleasantness of having to terminate an individual, the experience is very traumatic for him and costly for EDS because of the loss of a trained team member. It is important to understand how to deal with the individual who is performing unsatisfactorily. You hope to avoid, if possible, the need for termination. The key point to remember in dealing with the performance problem is that our aim is to salvage and not to scrap. This aim does not, however, give you license to avoid terminating an unsatisfactory individual.
 
 
 16
 (App. 726).
 
 
 17
 EDS has several basic reasons for terminating an individual:
 
 
 18
 --failure to perform the duties of the job,
 
 
 19
 --violation of company policy or terms of the Employee Agreement,
 
 
 20
 --disruptive influence, or
 
 
 21
 --insubordination.
 
 
 22
 (App. 729).
 
 
 23
 Both Managing People and Leading People also contain the following provisions:
 
 
 24
 This manager's guide serves as a reference for managing the people resource of EDS. The philosophies and suggestions included are not intended to dictate rigid conformity to established policies and procedures, but rather to offer ideas to help managers deal with the challenge of developing people to their full potential....
 
 
 25
 ....
 
 
 26
 This book is intended for use by EDS managers only. It should not be made available to non-management personnel except as a training tool for those people whom you are preparing for management positions....
 
 
 27
 (App. 465-66).
 
 
 28
 When questioned about the handling of employee performance problems according to the written management materials, Rosinski referred to these materials as "guidelines" and stated that, as a manager, he might not follow them because "[m]anagers have total prerogative on how they do things." (App. 896-97). At another point in his testimony, Rosinski stated, "I think [the management manuals are] stronger than guidelines. They're requirements that you should strongly consider." (App. 929). Gary Rudin, a divisional manager for BOC headquarters, testified that Leading People is merely a guideline and that the six-step procedure exists to assist managers in dealing with employees who have performance problems. Robert Fotsch, Rosinski's supervisor while Rosinski was an account manager, testified that there was no set way to deal with performance problems and that he understood he could vary from the six-step method if the circumstances warranted, as it was only a discretionary guideline. In his affidavit filed in response to defendant's motion for summary judgment, Rosinski stated that he was told in the training course that the "policies, practices, and procedures set forth in Managing People, as they relate to appraisals, disciplinary procedures and termination of employment, are mandatory and must be followed," and they ensure that "no EDS employee is discharged without good cause." (App. 694).
 
 
 29
 According to Fotsch, soon after Rosinski became account manager, it became apparent to Fotsch that Rosinski was not satisfactorily fulfilling his duties, and performance deficiencies included his lack of attention to and understanding of the profit and loss statements for his account. On November 20, 1986, Rosinski received a written appraisal that rated his work performance as "marginal," and within a few days he was given a "performance improvement plan" (PIP) requiring him to successfully complete certain finite tasks and show improvement in his ongoing responsibilities. Plaintiff was fired on December 18, 1986, less than four weeks after receiving his marginal performance rating. Fotsch contends that plaintiff was fired for failing to meet the requirements of the PIP. Rosinski asserts that Fotsch had given him six weeks to accomplish the tasks in the PIP and, although he was not given the time he was promised, he contends that he completed the tasks set forth in the PIP in a timely and satisfactory manner.[4]
 
 
 30
 Rosinski filed this action in the Circuit Court for the County of Macomb alleging breach of an employment contract, fraudulent misrepresentation, tortious interference with a contractual relationship, and tortious interference with an advantageous business relationship. After plaintiff voluntarily dismissed the tortious interference counts, EDS removed the case to the United States District Court for the Eastern District of Michigan on the basis of diversity jurisdiction. Thereafter, the district court granted EDS's motion for summary judgment on the remaining two counts of plaintiff's complaint. Although plaintiff appeals the grant of summary judgment, he does not contest the portion of the court's order that dismissed his claim for fraudulent misrepresentation.[5] Further, Rosinski now asserts, for the first time on appeal, a claim of promissory estoppel.
 
 II.
 
 31
 We review a district court's grant of summary judgment de novo. Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987). Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Of course, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).
 
 
 32
 The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record demonstrating the absence of a material issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Potters Medical Center v. City Hosp. Ass'n, 800 F.2d 568, 572 (6th Cir.1986). The non-moving party must then go beyond the pleadings and come forward with specific facts showing that there is a genuine issue of material fact. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his or her claim, summary judgment is appropriate. Fed.R.Civ.P. 56(e).
 
 
 33
 Michigan law recognizes the general rule that employment for an indefinite term is "terminable at the will of either party" at any time for any or no reason. Lynas v. Maxwell Farms, 279 Mich. 684, 687, 273 N.W. 315, 316 (1937). However, in Toussaint v. Blue Cross & Blue Shield, 408 Mich. 579, 292 N.W.2d 880 (1980), the court stated "that an employer's express agreement to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." 408 Mich. at 610, 292 N.W.2d at 890. Such a provision may become part of the contract "either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements." 408 Mich. at 598, 292 N.W.2d at 885. In the instant case, there is no explicit written agreement to terminate only for just cause. Nevertheless, Rosinski relies upon both prongs of Toussaint, arguing that express oral agreements and company policy statements give rise to a contract to terminate only for just cause.
 
 
 34
 However, Toussaint held that employers can avoid misunderstanding over the term of employment by establishing "a company policy of requiring prospective employees to acknowledge that they served at the will or the pleasure of the company...." Toussaint, 408 Mich. at 612, 292 N.W.2d at 891.
 
 
 35
 Where the employer has not agreed to job security, it can protect itself by entering into a written contract which explicitly provides that the employee serves at the pleasure or at the will of the employer or as long as his services are satisfactory to the employer.
 
 
 36
 Toussaint, 408 Mich. at 612 n. 24, 292 N.W.2d at 891 n. 24. Thus, Toussaint did not "recognize employment as a fundamental right or create a new 'special' right. The only right held in Toussaint to be enforceable was the right that arose out of the promise not to terminate except for cause." Valentine v. General Am. Credit, Inc., 420 Mich. 256, 258-59, 362 N.W.2d 628, 629 (1984). "Employers and employees remain free to provide, or not to provide, for job security. Absent a contractual provision for job security, either the employer or the employee may ordinarily terminate an employment contract at any time for any, or no, reason." Id.
 
 
 37
 In the instant case, the district court found that plaintiff was put on notice of his at-will status with EDS by virtue of plaintiff's participation in the EDS stock incentive plan, which acknowledged the right "of the company to terminate any participant's employment at any time, for any reason." Plaintiff does not dispute that he accepted and signed the restricted stock agreement to which this statement was appended. Rather, Rosinski simply argues that the language, "at any time, for any reason," implies the employer must have a valid reason for his termination. We disagree and find that the language was intended to reiterate the company policy that a participating employee serves at the will of the employer.
 
 
 38
 Although the at-will language in the stock agreement is clear, we recognize that the agreement is a collateral document and not part of the employment application. However, in this case, Rosinski testified that he voluntarily transferred to EDS because the stock incentive plan was "a motivating factor." Because Rosinski viewed the stock agreement, which he signed, as integral to his decision to take employment with EDS, the at-will employment policy expressed in that agreement is significant. "Though Toussaint holds that there may be an implied contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will." Reid v. Sears, Roebuck & Co., 790 F.2d 453, 462 (6th Cir.1986). Because EDS expressly reiterated its employment policy to Rosinski in the stock agreement, EDS has, in fact, provided the employee with a writing setting out its at-will policy. Consequently, Toussaint claims relying upon oral assurances and policy statements made subsequent to these expressions lack merit. Duncan v. Rolm Mil-Spec Computers, 917 F.2d 261, 263-64 (6th Cir.1990); Pratt v. Brown Mach. Co., 855 F.2d 1225, 1234-35 (6th Cir.1988).
 
 
 39
 Plaintiff relies on the fact that he and other transferees did not sign the at-will contract normally required by EDS for new employees, arguing that this constitutes evidence that EDS did not consider his employment terminable at will. However, assuming arguendo that the stock incentive agreement would not constitute a written notice, the general rule remains that, absent a contrary agreement, an employment relationship of indefinite duration is terminable at will. Lynas, 279 Mich. at 687, 273 N.W. at 316. Thus, although this case would present a closer question if EDS nowhere expressly provided that plaintiff's employment was "at will," we would still find the oral assurances and policy statements relied upon by plaintiff insufficient to establish either an express agreement, or a legitimate expectation, that employment was terminable only for just cause.[6]
 
 
 40
 The only facts asserted by Rosinski that could support a finding of an express agreement to terminate for cause are the allegations presented in his affidavit, made and filed subsequent to defendant's motion for summary judgment. In this affidavit, Rosinski stated that, at the time he was considering transferring to EDS, "Mr. Simenton assured me EDS does not dismiss employees without cause." Rosinski also asserts that the same representation was made when he subsequently moved to his position as account manager, claiming he was told in a training course that the "appraisal procedure, together with the mandatory progressive disciplinary procedure, ensures that no EDS employee is discharged without good cause." (App. 694).
 
 
 41
 However, where the record does not present a genuine issue of material fact, once a summary judgment motion has been made, a party may not create a factual issue by filing an affidavit which contradicts earlier deposition testimony. Reid, 790 F.2d at 460 (citing Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir.1984). In both Reid, 790 F.2d at 460, and Biechele, 747 F.2d at 251, we stated:
 
 
 42
 If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.
 
 
 43
 Nowhere in his deposition testimony does Rosinski recite the claim, made in his affidavit, that Simenton or any other EDS representative expressed to him that employees would not be dismissed without good cause. Although this does not represent a direct contradiction between his affidavit and prior testimony, the belated claim that he was told that employees would not be dismissed "without cause" points to a significant omission in Rosinski's deposition. Moreover, the affidavit attempts to create an issue of fact, where none had existed prior to the affidavit, on a subject that Rosinski testified to at great length and at a time when he had the opportunity to fully develop a record in support of his claim. Rosinski testified that when he expressed concerns about job security at EDS, Simenton simply replied that he did not anticipate any layoffs because EDS was generally in a growth mode and "the job situation would be stable and good if they did their work properly." Although not in direct contradiction to Rosinski's affidavit, this testimony is certainly inconsistent with the affidavit, particularly when Rosinski was specifically asked in deposition, "Was there anything else George Simenton told you with respect to job security....?" Rosinski simply replied, "[H]e gave me assurance that I had nothing to worry about with EDS...." (App. 648). Understandably, and according to his own testimony, these assurances failed to allay Rosinski's concerns about job security. Only in response to defendant's motion for summary judgment does plaintiff seek to transform these vague assurances into an explicit statement that he could be discharged only for cause. Further, Rosinski's deposition testimony also belies the assertion in his affidavit that he was told the "mandatory" progressive disciplinary procedure "ensures that no EDS employee is discharged without good cause." When questioned about the handling of employee performance problems according to the written management materials, Rosinski testified that they are requirements that "you should strongly consider," but that he might not follow these "guidelines" because "[m]anagers have total prerogative on how they do things." (App. 896-97).
 
 
 44
 Plaintiff's affidavit is inconsistent with his deposition testimony, which testimony was insufficient to create a dispute of fact on the issue of whether an express agreement was made that employment was terminable only for cause. Thus, the affidavit cannot serve to establish a genuine issue of material fact on the issue of an express just-cause agreement.[7] However, we still face the question whether a just-cause agreement can be implied from defendant's policies and procedures. In the absence of an express agreement, the enforceability of an implied promise is dependent upon the legitimacy of the employee's expectations as they arise from the employer's policy statements. Toussaint, 408 Mich. at 598, 292 N.W.2d at 885; Dzierwa v. Michigan Oil Co., 152 Mich.App. 281, 285, 393 N.W.2d 610, 612 (1986). However, "[a] mere subjective expectancy of continued employment on the part of an employee will not justify an expectation of termination for just cause only." Dzierwa, 152 Mich.App. at 285, 393 N.W.2d at 612; Schwartz v. Michigan Sugar Co., 106 Mich.App. 471, 478, 308 N.W.2d 459, 462 (1981), leave denied, 414 Mich. 870 (1982). Thus, the question remaining is whether the defendant's policies and procedures could have led plaintiff to legitimately expect that he would not be discharged except for just cause. We find the evidence insufficient to give rise to such an implied promise.
 
 
 45
 The policy statements purportedly relied upon by plaintiff at the time of transition have nothing to do with employment termination. For example, statements from the EDS publication "In Sync" represent to transferring employees that there will be great job security, diverse opportunities, and no loss of such benefits as "COLA, overtime, shift premium, holidays, 'layoff' benefits, job security, etc." The newsletter further represents that "[t]here is great job security at EDS because of its annual and profitable growth rates.... EDS has never had a layoff of employees." Like Simenton's assurances that "the job situation would be stable and good if they did their work properly," these statements refer to the anticipated successful performance of EDS and the security of EDS's position in the market place if things go well. They are not promises with respect to the specific tenure that any particular employee will enjoy with the company, and, to the extent that assurances are made, they are designed to show the benefits of the proposed employment relationship. Such statements are not sufficient to give rise to a just-cause contract. Statements made by an employer with respect to its organization, the possibility of advancement, and employee benefits and salaries are not promises or statements about the employer's termination policy but, rather, are indicative of what the employee can expect through continued employment. Dzierwa, 152 Mich.App. at 285-86, 393 N.W.2d at 612-13; Carpenter v. American Excelsior Co., 650 F.Supp. 933, 936 n. 6 (E.D.Mich.1987). Any expectation to the contrary is not reasonable and merely subjective.
 
 
 46
 The same can be said of the statements from the management training materials received by Rosinski when he became an account manager. Most of the statements concern general management principles and have nothing to do with terminations. Although two provisions cited by plaintiff in Managing People pertain to the management task of terminations[8] and possible reasons for termination,[9] they do not limit the circumstances or conditions under which EDS may terminate employment. Although basic reasons for terminating employment are listed, "[t]he fact that certain acts were identified as conduct that might lead to discharge did not indicate that these acts were the exclusive permissible grounds for discharge." Reid, 790 F.2d at 460. The mere enumeration of reasons for discharge does not create a just-cause employment contract. Pratt, 855 F.2d at 1234-35; Dell v. Montgomery Ward & Co., 811 F.2d 970, 974 (6th Cir.1987).[10]
 
 
 47
 Furthermore, the management materials provided to Rosinski during his management training course were never intended or understood to be a part of the employment contract. Managing People expressly provides that it is "intended for use by EDS managers only" and "should not be made available to non-management personnel except as a training tool." Rosinski does not dispute that he received the guide in his capacity as a supervisor or that it was not distributed to non-supervisory personnel. Consequently, these materials were not employee policy handbooks distributed to employees with the intent of eliciting enhanced performance and, thus, were not used to create the "situation instinct with obligation" that Toussaint recognized as the basis for an implied duty not to discharge except for cause. Toussaint, 408 Mich. at 613, 292 N.W.2d at 892. Moreover, the management guide further provides:
 
 
 48
 This manager's guide serves as a reference for managing the people resource of EDS. The philosophies and suggestions included are not intended to dictate rigid conformity to established policies and procedures, but rather to offer ideas to help managers deal with the challenge of developing people to their full potential ...
 
 
 49
 Thus, even though the guide lists reasons for discharge, the fact that it does not purport to establish policy and was never held out to Rosinski as representing the terms of his employment means that it cannot reasonably be understood as such, and his asserted contrary expectation is not legitimate. See Triplett v. Electronic Data Sys., 710 F.Supp. 667, 673 (W.D.Mich.1989), aff'd, 900 F.2d 260 (6th Cir.1990).
 
 
 50
 Rosinski's reliance on EDS's six-step disciplinary procedure is equally unavailing, as the source of that procedure is the Managing People manual. Assuming, as Rosinski asserts, that Simenton assured him that this six-step procedure "would be available to any person who had a potential problem" learning their job responsibilities, the mere fact that an employer has a procedure designed to give employees an opportunity to improve performance does not by itself support a legitimate expectation of a just cause employment relationship. Dell, 811 F.2d 970. The existence of a program that notifies employees that their performance is deficient and provides them an opportunity to improve is insufficient to transform an at-will contract into a just-cause contract. Duncan, 917 F.2d at 264.
 
 III.
 
 51
 Plaintiff also raises a claim of promissory estoppel, apparently for the first time on appeal, asserting that EDS should be estopped from raising the defense that Rosinski was an at-will employee. We reject this argument for two reasons. First, Rosinski bases this claim upon the assertion that he relied on EDS's promises that he would not be discharged without good cause. Plaintiff alleges the same promises that constitute the basis of his breach of contract claim, and our conclusion on that issue--that EDS made no promises that Rosinski would be discharged only for cause--also disposes of Rosinski's promissory estoppel argument. Second, insofar as the claim of estoppel can be construed as raising issues not governed by the Toussaint wrongful discharge claim, issues not presented to the district court but raised for the first time on appeal are not properly before this court. Boone Coal & Timber Co. v. Polan, 787 F.2d 1056, 1064 (6th Cir.1986).
 
 
 52
 AFFIRMED.
 
 
 
 *
 Honorable Thomas A. Higgins, United States District Court for the Middle District of Tennessee, sitting by designation
 
 
 [1]
 The "Six-Step Method" is described in materials provided to supervisors during management training and "provides a structure for progressive discipline that helps the leader deal quickly and fairly with marginal performance." (App. 728). This six-step method provides for early recognition of problems, early notification, observation and documentation, verbal warning, improvement plans, and improvement or termination of employment. (App. 735)
 
 
 [2]
 In addition to his discussion with Simenton, Rosinski relies upon a videotape made by GM and EDS that addressed worker concerns about the transition. Although Rosinski never viewed the tape during the transition period, having seen it for the first time in his lawyer's office, he claims that before his transfer he discussed the tape with co-workers who did see it. As explained to Rosinski by his co-workers, the videotape indicated no need to worry about job security if you do good work because EDS is a growth company that perceives no future problems. (App. 115-17). In addition, "they were talking about the appraisal process and these six steps. At the time, I didn't quite know what it entailed...." (App. 763-64)
 
 
 [3]
 Among the passages relied upon by plaintiff are the following:
 Maintain discipline. Communicate standards and rules and the reasons for them. Be consistent and reasonable when disciplining team members.
 ....
 To Comply with EDS Policies and Procedures --Ensure that tasks are fulfilled in accordance with EDS policies and procedures, making certain that your people understand the reasons for these policies and procedures.
 (App. 720, 721).
 Allow time for decisions and for people to work. While a moderate degree of impatience is necessary for timely progress, give your decisions and people a chance to work. Guard against changing your decision when progress is not immediately apparent. Determine a schedule at the start; then, if nothing happens at the correct time, take corrective action.
 (App. 732).
 Two Key Principles
 
 
 *
 The individual is the center of responsibility and authority
 
 
 *
 Every action, policy, or procedure must have a business reason as a basis
 (App. 736).
 
 
 [4]
 Plaintiff relies on a memorandum attached to the PIP that he received from Fotsch, which states in pertinent part:
 Attached is a list of tasks that must be accomplished over the next six weeks. I will monitor your performance of these tasks. As stated in our conversation on November 26, 1986, you feel that these tasks are reasonable and can be accomplished over this six week period. EDS values you as an employee and will strive to retain you as a member of our team if your performance meets the goals we have set.
 I will be available to assist you in any way I can. I will also make an effort to monitor your performance on a daily basis.
 It is necessary that your performance improve immediately and that the tasks outlined on the attached pages be performed on time and in a satisfactory manner or the situation will result in dismissal. If you successfully complete your improvement plan, your performance must be maintained. A decline in performance could be cause for dismissal without another warning or improvement plan.
 (App. 688).
 
 
 [5]
 Issues which were raised in the district court, yet not raised on appeal, are considered abandoned on appeal and not reviewable. See McMurphy v. City of Flushing, 802 F.2d 191, 198-99 (6th Cir.1986). Therefore, because Rosinski fails to address on appeal his claim of fraudulent misrepresentation, that claim is abandoned and beyond review
 
 
 [6]
 Because we find that Rosinski's employment with EDS could be terminated at will and without cause, we need not address defendant's contention that it had just cause to fire Rosinski on the basis of his deficient job performance
 
 
 [7]
 In a letter filed with this court to supplement his brief, plaintiff cited Schippers v. SPX Corp., 186 Mich.App. 595, 465 N.W.2d 34 (1990), for the proposition that, even absent his affidavit, his deposition testimony is sufficient to create a question of fact on whether Simenton's oral representations constituted a promise to discharge only for cause. In Schippers, 186 Mich.App. at 596-97, 465 N.W.2d at 35, the Michigan Court of Appeals held that the deposition testimony of the plaintiff was sufficient to create a question of fact where the plaintiff testified that he inquired about his future with the company and was told the job was his until retirement "unless something was really wrong." At first glance, this appears analogous with the situation presented here, as Rosinski testified that he inquired about his future with EDS and was told by Simenton that "the job situation would be stable and good if they did their work properly." However, Schippers is distinguishable in two important respects. Unlike the plaintiff in Schippers, a case involving no express at-will policy by the employer, Rosinski received written notice of his at-will status in the stock agreement. Further, the court's holding in Schippers relied in part on the testimony of an employee, who allegedly gave the plaintiff the assurances at issue, that it was the custom and practice of the company to discharge for "good reason." In Rosinski's case, the deposition testimony of other current and former EDS employees is consistent with EDS's position that employees are terminable at will
 
 
 [8]
 The passage referred to here, and cited often by plaintiff, is the previously quoted passage advising managers that "[i]t is important to understand how to deal with the individual who is performing unsatisfactorily.... [A]void, if possible, the need for termination. The key point to remember ... is that our aim is to salvage and not to scrap."
 
 
 [9]
 The passage referred to here is the previously quoted excerpt from the management materials listing four basic reasons for termination: "failure to perform the duties of the job, violation of company policy or terms of the Employment Agreement, disruptive influence, or insubordination."
 
 
 [10]
 In his letter supplementing his brief, plaintiff cited Schippers, 186 Mich.App. at 597-98, 465 N.W.2d at 36, for the proposition that an enumeration of reasons for discharge is sufficient to raise an issue of fact on the question whether a just-cause contract exists. However, such a proposition is directly contrary to this court's holding in Pratt, 855 F.2d at 1234. Schippers relied on the decision of another panel of the Michigan Court of Appeals in Dalton v. Herbruck Egg Sales Corp., 164 Mich.App. 543, 417 N.W.2d 496 (1987), which held that a progressive discipline procedure enumerating acts that will result in discipline creates a question of fact on whether a contract with a just-cause policy has been formed, even when the employer has otherwise expressly provided that employment is at will. 164 Mich.App. at 547, 417 N.W.2d at 498. Dalton was expressly rejected by this court in Pratt, where we stated:
 While it is true that "[t]he law of Michigan is controlled by a decision of the Michigan Court of Appeals until the Michigan Supreme Court or another panel of the Michigan Court of Appeals rules otherwise," Wieczorek v. Volkswagenwerk, A.G., 731 F.2d 309, 310 (6th Cir.1984) (citations omitted), it is equally true that we need not blindly follow such precedent where we are " 'convinced by other persuasive data that the highest court of the state would decide otherwise.' " Kochins v. Linden-Allmak, Inc., 799 F.2d 1128, 1140 (6th Cir.1986) (quoting Clutter v. Johns-Manville Sales Corp., 646 F.2d 1151, 1153 (6th Cir.1981)). We believe Dalton is inconsistent with the teachings of Toussaint and its progeny, and thus subscribe to the better reasoned analysis of Judge Lively in Reid v. Sears, Roebuck & Co., 790 F.2d 453 (6th Cir.1986).
 Pratt, 855 F.2d at 1234 n. 11. We are bound by the decision in Pratt, as a panel of this court cannot overrule the decision of another panel. Salmi v. Secretary of Health & Human Servs., 774 F.2d 685, 689 (6th Cir.1985). Thus, unless an inconsistent decision of the United States Supreme Court or a decision of this court sitting en banc overrules the prior decision, or unless the Michigan legislature or Michigan Supreme Court determines the law of Michigan to be otherwise, the holding in Pratt is controlling.