*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AEREL, S.R.L.,

　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

　　　　　　　　　　　　No. 05-3864

PCC AIRFOILS, L.L.C.,

　　　　　　　*Defendant-Appellee.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00744—Patricia A. Gaughan, District Judge.

Argued: April 25, 2006

Decided and Filed: May 23, 2006

Before: SUHRHEINRICH, GILMAN, and ROGERS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Timothy John Fitzgerald, GALLAGHER SHARP, Cleveland, Ohio, for Appellant. M. Neal Rains, FRANTZ WARD LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Timothy John Fitzgerald, George H. Carr, James F. Koehler, GALLAGHER SHARP, Cleveland, Ohio, for Appellant. M. Neal Rains, Lindsey A. Carr, FRANTZ WARD LLP, Cleveland, Ohio, for Appellee.

———————————

**OPINION**

———————————

　　　RONALD LEE GILMAN, Circuit Judge. Aerel, S.R.L., an Italian company that served as the exclusive sales agent for PCC Airfoils, L.L.C. in Italy, sued PCC for the breach of a contract that the parties executed in 2000. PCC is an Ohio-based company that provides castings for parts used in jet engines and power generating equipment. Aerel maintains that the contract required PCC to pay Aerel commissions for all orders that Aerel obtained for PCC in Italy during the term of the contract, even if those orders were not finalized until after the contract had expired. The district court concluded that the contract unambiguously permitted PCC to cease paying commissions upon the termination of the contract on December 31, 2002, and therefore granted summary judgment in favor of PCC. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

## I.  BACKGROUND

### A.    Factual background

Aerel entered into its first contract with PCC in July of 1987.  Under that contract, PCC agreed to pay Aerel commissions at a rate of 4% on the sale of certain PCC products in Italy, with the understanding that higher or lower commissions on other products or services could be established by mutual agreement.  Commission payments were to extend for 18 months following the 1989 expiration date of the contract.  Aerel would thus receive commissions during this extended period on orders placed, but not completed or paid for, during the contract term.  Article V of the contract provided in relevant part as follows:

> 5-C    Upon the termination of this AGREEMENT, PCC Airfoils, Inc.['s] obligation to pay commission on sales of PRODUCTS promoted by AEREL hereunder shall cease except AEREL shall be paid commission on purchase orders then in force for castings to be delivered up to 18 months after the termination of the contract where the PRODUCTS covered thereby have not been delivered or paid for.

After the initial contract expired in December of 1989, the parties renewed their arrangement with similar agreements—all of which contained ¶ 5-C—in 1990, 1993, and 1995.  Aerel continued to serve as PCC's exclusive sales agent in Italy following the expiration of the 1995 agreement, but operated without a written contract.

In July of 2000, the parties signed a new sales agreement that modified their previous arrangement.  Three provisions of the 2000 contract are at issue in the present case:

> 2-F    PCC AIRFOILS, INC. agrees to pay AEREL in full under terms of net thirty (30) days from the date of receipt of payment to PCC AIRFOILS, INC. from the customer.
>
> 2-G    On all sales originating from the Territory, PCC AIRFOILS, INC. shall pay AEREL as follows:
>
>> 1.    Tooling and fixtures                                         0%
>>
>> 2.    Commission to be paid for CF6-8OC2 and GE90 airfoils sold to any Italian customer will not exceed                 2%
>>
>> 3.    Castings for any other program of PCC AIRFOILS, INC.                                                4%
>>
>> 4.    It is understood that higher or lower commissions may be required with regard to certain products or services, by mutual agreement.
>
> ***
>
> 5-B    Upon the termination of this Agreement, PCC AIRFOILS, INC.['s] obligation to pay commission on sales of Products promoted by AEREL hereunder shall cease.

Just three months after signing the new contract, the parties further modified the terms of the agreement by amending subparagraph 2 of ¶ 2-G to include other PCC products at the 2% rate.

Absent from the 2000 contract, however, was any language confirming Aerel's right to commission payments for timely placed orders delivered and paid for during the 18 months after the contract terminated. All of the prior contracts between the parties had included that language in ¶ 5-C.

Luciano Cosentini, Aerel's principal, testified in his deposition that he knew of the change in the language and was not pleased with it. But he acknowledged that he had signed the 2000 contract voluntarily. Notwithstanding this testimony, Cosentini filed an affidavit accompanying Aerel's motion for partial summary judgment in which he offered a detailed reason for the deletion of ¶ 5-C. Cosentini claimed that the language previously in Article V was eliminated because Aerel had requested a commission "tail" that would have permitted Aerel to collect commissions on orders that were negotiated directly by PCC, without Aerel's help, after the contract had expired. Aerel insisted that it was entitled to these extra commissions because it had developed a market in Italy for PCC products. But PCC rebuffed Aerel's efforts and, according to Cosentini, employed language in the new ¶ 5-B that expressly rejected the idea of commission tails. Cosentini maintained, however, that this did not alter his ongoing oral understanding with PCC's Sales Director Alan Peterson that Aerel would continue to receive commissions on all Aerel-obtained orders placed during the contract term, even if those orders were not completed and paid for until after the contract expired.

During the term of the 2000 contract, Aerel negotiated blanket purchase orders of PCC products with two Italian companies, FiatAvio and Nuovo Pignone. As the parties explained at oral argument, the blanket purchase orders in question, although submitted during the period of the agreement, did not become binding contracts until both the purchaser and PCC confirmed a specific draw-down against the blanket purchase order. These specific purchase orders led to continued sales in 2003, 2004, and 2005. In 2003, for example, sales under the specific purchase orders totaled $30,974,297. The FiatAvio purchase orders expired at the end of 2003, but the Nuovo Pignone orders still led to significant sales in 2004 and 2005. At the rates in the 2000 contract, Aerel estimated that it would have earned over $650,000 in commissions on the FiatAvio and Nuovo Pignone purchase orders between 2003 and 2005. But in October of 2002, two months before the contract was set to expire, PCC informed Aerel that the sales arrangement would not be renewed. PCC sent a check and an accompanying explanatory letter in March of 2003, purporting to pay Aerel for all of the commissions owed under the expired contract.

## B.    Procedural background

Aerel filed its complaint in the district court in April of 2004. The complaint sought recovery under the theories of breach of contract, quasi-contract, and unjust enrichment. After attempts at mediation failed, PCC filed a motion for summary judgment. Aerel responded with a cross-motion for partial summary judgment. The district court denied Aerel's cross-motion and granted PCC's motion. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 371 F. Supp. 2d 933, 943 (N.D. Ohio 2005). Aerel argued that the language of the contract clearly requires PCC to pay commissions on all orders initiated during the contract period or, in the alternative, that the contract was ambiguous. Rejecting both of these arguments, the district court held that, under ¶ 5-B of the contract, "Aerel is not entitled to commissions after the termination of the contract." *Id.* at 939.

The district court also rejected Aerel's contention that an alleged oral modification of the terms of ¶ 5-B after the contract was executed precluded summary judgment. This contention, the district court observed, was supported only by Cosentini's affidavit. *Id.* at 941. In paragraphs 7 and 11 of the affidavit, Cosentini averred that PCC Sales Director Peterson had told him during and after the negotiation of the 2000 contract that Aerel would receive the contested commissions, and that Peterson's representations "either confirmed [his] interpretation of the written contract, or modified the written contract to match [his] previous interpretation." But the district court determined that these statements should have been revealed in Cosentini's deposition testimony. It therefore struck

the two paragraphs in the affidavit that related to the alleged oral modification. *Id.* at 942. Finally, the district court granted summary judgment to PCC on the quasi-contract and unjust-enrichment claims, neither of which Aerel has pursued on appeal. *Id.* at 943.

## II. ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    The district court did not err in determining that no commissions were due after the contract expired

Aerel first argues, as it did before the district court, that ¶ 2-G of the contract clearly entitles Aerel to all of the post-termination commissions that it seeks. This argument fails for two reasons. The first is that Aerel itself recognizes that the operative phrase in ¶ 2-G—"sales originating from the Territory"—"is susceptible to two or more reasonable interpretations." *See Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996) ("Contract language is ambiguous if it is subject to two reasonable interpretations."). Those varied interpretations center on the word "originating," which could mean simply "ordered," or, alternatively, could include the entire transactional process, from placement of the order through manufacturing, shipping, and receipt of payment. In other words, ¶ 2-G, standing alone, does not answer the question of whether the contract required PCC to pay Aerel commissions for products ordered, but not yet shipped, accepted, or paid for, during the term of the contract.

The second reason that Aerel's argument fails is that ¶ 5-B specifically covers the topic of post-termination commissions and therefore supersedes the more general terms of ¶ 2-G. Under Ohio law, "[a] specific provision controls over a general one." *Monsler v. Cincinnati Cas. Co.*, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991); *see also BP Chemicals, Inc. v. First State Ins. Co.*, 226 F.3d 420, 426-27 (6th Cir. 2000) (explaining the principle that "more specific provisions control over general ones"). Unlike ¶ 2-G, which governs commission rates generally for "all sales" during the contract period, ¶ 5-B focuses on the precise time when PCC's duty to pay commissions ended.

The latter paragraph fixes the cessation of that duty at the termination of the contract, and does so in plain terms. Aerel's response—that ¶ 5-B refers only to "products that had *previously* been promoted by Aerel"—is unpersuasive both because it adds a nonexistent term to an otherwise clear contractual provision and because, as soon as the contract period ended, *any* PCC product promoted by Aerel would be one that Aerel "previously promoted." Because the plain language of ¶ 5-B controls and displaces the general terms of ¶ 2-G, and because ¶ 2-G does not address the payment of post-termination commissions, we reject Aerel's first argument.

Aerel's alternative argument is that ¶¶ 2-F and 2-G, when juxtaposed with ¶ 5-B, create an ambiguity that must be construed against PCC as the drafter. *See Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) (reciting the rule that "a contract is to be construed against the party who drew it"). Rejecting this contention, the district court concluded that the unambiguous language of ¶ 5-B controls the issue of post-termination commissions. *Aerel*, 371 F. Supp. 2d at 939. The

district court further reasoned that the structure of the contract favored the interpretation advocated by PCC, since Article II discusses the various aspects of the parties' dealings during the contract term, whereas the two provisions in Article V specifically refer to when the contract expires and what happens upon termination. *Id.* at 940.

We agree with the district court's interpretation of the contract and reject Aerel's argument that the contract is ambiguous. Aerel insists that the phrase "sales of Products promoted by AEREL hereunder" in ¶ 5-B is susceptible to at least two reasonable interpretations, one of which is that the phrase refers only to those products "previously promoted and marketed by Aerel." These latter products would be distinguished from products sold by PCC to existing customers during the requested tail period that would follow the termination of the contract. Aerel's reading of this otherwise straightforward language is an obvious attempt to create ambiguity where none exists, an attempt that contravenes Ohio law in two ways.

The first way is that Aerel, in support of its reading, relies on the extrinsic evidence of its request for commission "tails" to prove that ¶ 5-B addressed only that request. Ohio courts, however, will "not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) (citations and quotation marks omitted); *see also Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992) (explaining that extrinsic evidence will "be considered in an effort to give effect to the parties' intentions" only if "the language of a contract is unclear or ambiguous"). No such patent ambiguity exists in the 2000 contract.

Second, Aerel appears to believe that the existence of competing readings of contractual language is sufficient in and of itself to render the provision ambiguous. This argument has been consistently rejected by various Ohio courts. *See, e.g.*, *Ohio Water Dev. Auth. v. W. Res. Water Dist.*, 776 N.E.2d 530, 535 (Ohio Ct. App. 2002) (explaining that "the fact that parties may adopt conflicting interpretations of a contract between them, while involved in litigation, will not create ambiguity or a basis for unreasonable interpretation of the language"). The Ohio Supreme Court has recently reaffirmed that a contract's susceptibility to more than one reading does not necessarily render the writing ambiguous. *See State v. Porterfield*, 829 N.E.2d 690, 692-93 (Ohio 2005) (discussing the "level of lucidity necessary for a writing to be unambiguous" in the context of statutory interpretation); *see also United Tel. Co. of Ohio v. Williams Excavating, Inc.*, 707 N.E.2d 1188, 1200 (Ohio Ct. App. 1997) (observing that contract language is ambiguous only if "it is susceptible of two conflicting but *reasonable* interpretations") (emphasis added). Aerel's proposed construction of ¶ 5-B strikes us as *unreasonable* because such a construction would require PCC to pay Aerel sales commissions for an indefinite period of time following termination—something that not even former ¶ 5-C required PCC to do under the previous agreements between the parties.

The structure of the contract also supports the district court's conclusion. Article II contains nine provisions that, among other things, established Aerel as PCC's exclusive sales representative in Italy, bound Aerel via a noncompete clause for one year after the contract period, and dictated the time of payment and the commission rates. In contrast, Article V contains only two provisions, the first of which set forth the beginning and the end of the contract period and the second of which, ¶ 5-B, eliminated PCC's obligation to pay commissions upon the termination of the contract. As explained above, nothing in Article II covers the payment of post-termination commissions, leaving the clear language of ¶ 5-B as the only section of the contract to address that issue directly. Paragraphs 2-F and 2-G are therefore logically read as governing particular aspects of the parties' ongoing relationship during the contract period, whereas ¶ 5-B resolves a question left unanswered by the former provisions.

The argument emphasized by Aerel in its Reply Brief—that the district court's attempt to harmonize Articles II and V leads to an absurd result—is likewise unpersuasive. Aerel contends

that, under the district court's interpretation of ¶¶ 2-F and 5-B, PCC could have refused to pay Aerel's commission on a completed contract if PCC's payment obligation did not mature until less than 30 days remained before the contract expired. This is possible, Aerel says, because ¶ 2-F required that PCC pay Aerel within 30 days of receiving payment from the customer, thereby permitting PCC to deprive Aerel of commissions otherwise due simply by withholding payment until after the contract expired.

We do not believe that the interpretation adopted by the district court leads to the absurd consequences that Aerel postulates. First and foremost, the scenario envisioned by Aerel is not the one at issue in the present case, which concerns blanket purchase orders that potentially generated commissions well after the termination date of the contract. These blanket purchase orders, as we explained above, did not become binding contracts—and thus did not generate sales commissions—until the customer confirmed a specific draw-down against its blanket purchase order.

Secondly, Aerel's counsel confirmed at oral argument that no commissions on these specific draw-downs became due in the last 30 days of the contract term. In any event, principles of equity, which "regard[] as done that which ought to be done," *Syring v. Sartorious*, 277 N.E.2d 457, 458 (Ohio Ct. App. 1971) (citations and quotation marks omitted), would likely have barred PCC from withholding commissions fully payable within 30 days of the contract's expiration.

Aerel therefore confuses a hypothetical attempt by PCC to deprive Aerel of commissions with PCC's right under the contract to decline to pay commissions on orders that were initially negotiated during the contract term but were not finalized until after termination. In other words, ¶ 5-B of the contract would not likely have permitted PCC to deny Aerel the commission payments otherwise due at the time of termination, but did permit PCC to refuse to pay commissions for orders that did not even become final until after the contract had expired. We acknowledge that, read in this manner, the 2000 contract might have decreased Aerel's incentive to seek out long-term contracts on PCC's behalf, and might also have affected Aerel's desire to work for PCC during the final months of the contract period. But enforcement of the document's unambiguous terms, although adverse to Aerel's financial interests, is no more absurd or manifestly unjust than refusing to grant PCC the benefit of a bargain that it successfully negotiated with another experienced commercial entity.

Finally, the district court correctly distinguished this court's decision in *Harry W. Applegate, Inc. v. Stature Electric, Inc.*, 275 F.3d 486 (6th Cir. 2001). As in the present case, *Applegate* involved a dispute over commissions on blanket purchase orders placed before the contract expired but not paid for until after termination. *Id.* at 488. This court first found that the written agreement was ambiguous and then, applying New York law, held that the plaintiff was entitled to the requested commissions. *Id.* at 489. Central to this court's holding was the fact—repeated three times in the opinion—that "the Agreement does not clearly provide a contrary provision." *Id.*; *see also id.* at 488 (mentioning twice that the plaintiff was entitled to the commissions under New York law because the agreement was silent on the issue). In the present case, in contrast, ¶ 5-B of the contract unambiguously addresses the issue of post-termination commissions and renders resort to default principles of state contract law unnecessary. Because Aerel's ambiguity argument finds no support in the decisions of either this court or the Ohio courts, we agree with the district court's conclusion that the contract was unambiguous.

## C.    The district court's decision to strike two paragraphs from Cosentini's affidavit

Aerel next attacks the district court's decision to strike paragraphs 7 and 11 from the post-deposition affidavit submitted by Cosentini. Had those sections of the affidavit not been excluded,

Aerel contends, there would have been a genuine issue of material fact as to whether the 2000 contact was orally modified after its signing. The district court based its decision on the rule that a party cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony. *See Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) ("[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony."); *see also Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (establishing this general principle). According to Aerel, the district court erred by extending the rule announced in *Reid*—which applies where the later affidavit "essentially contradicts" the earlier testimony—to a situation where the affidavit covers a topic omitted in the prior testimony.

We will not overturn a district court's decision to grant or deny a motion to strike an affidavit unless the lower court abused its discretion. *Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 304 (6th Cir. 2005) (applying the abuse-of-discretion standard in evaluating a challenge to the district court's decision to strike the affidavit of an expert witness). A district court abuses its discretion when it "relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Reeb v. Ohio Dept. of Rehabilitation and Correction*, 435 F.3d 639, 644 (6th Cir. 2006).

In striking the two paragraphs from Cosentini's affidavit, the district court relied both on the general rule announced in *Reid* and also on three unpublished opinions from this court applying that rule. *Aerel*, 371 F. Supp. 2d at 942 (citing the three unpublished decisions of *Lockard v. General Motors Corp.*, 52 F. App'x 782, 788-89 (6th Cir. 2002), *Smith v. Consolidated Rail Corp.*, No. 95-3727, 1996 WL 366283, at *4 (6th Cir. 1996), and *Rosinski v. Electronic Data Systems Corp.*, No. 90-2133, 1991 WL 105747, at *6 (6th Cir. 1991) (per curiam)). This court's decision in *Smith v. Consolidated Rail Corp.* provides little insight into the present case because that decision concerned only the basic factual setting addressed in *Reid*, where the deponent had been "specifically questioned" about the key factual issue. *See Smith*, 1996 WL 366283, at *4; *Reid*, 790 F.2d at 460.

The *Rosinski* decision, however, expands the *Reid* rule to cover a situation in which the later-filed affidavit revealed an omission in the party's deposition testimony. *See Rosinski*, 1991 WL 105747, at *6 (striking an affidavit that, though not directly contradictory, "point[ed] to a significant omission in" the plaintiff's deposition testimony). Finally, the court in *Lockard* appears to have recast one of the policy justifications underlying the *Reid* rule—that a party's "ample opportunity during discovery to present evidence provides courts with reason to prevent that party from introducing new evidence in an affidavit opposing summary judgment"—as an independent ground for striking portions of an affidavit. *See Lockard*, 52 F. App'x at 789 (citing *Biechele v. Cedar Point, Inc.*, 747 F.3d 209, 215 (6th Cir. 1984)).

In our opinion, the expansive view of the *Reid* rule adopted in the latter two of these nonprecedential opinions is unwarranted. The rule set forth in *Reid* is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists. *Reid* and its progeny have thus barred the nonmoving party from avoiding summary judgment by simply filing an affidavit that directly contradicts that party's previous testimony. *See, e.g.*, *Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 619 (6th Cir. 2001) (holding that a post-deposition affidavit submitted by the plaintiff's expert was "not cognizable for purposes of the summary judgment decision" because it was "plainly contradictory" to the expert's previous deposition testimony).

This is a far cry, however, from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more

information, rather than less, at the crucial summary judgment stage.  Because the deponent is under no obligation to volunteer information not fairly sought by the questioner, we see no reason to apply *Reid* and its progeny to such a situation.  *See Bass v. City of Sioux Falls*, 232 F.3d 615, 618 (8th Cir. 1999) (reversing the district court's decision to disregard an allegedly inconsistent affidavit because the deponent "had no duty to volunteer [the relevant] information during the deposition absent a question from plaintiffs' counsel seeking that information"); *see also In re B-E Holdings, Inc.*, 240 B.R. 751, 753 (Bankr. E.D. Wisc. 1999) (observing that although deponents must appear and provide forthright answers, they need not "volunteer information, explain trial strategies, or reveal privileged information").

Our conclusion is in accord with the variations of the *Reid* rule adopted by our sister circuits. As the Supreme Court has observed, the lower federal courts

> have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (collecting cases).  These rules invariably reflect the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact.  The Fifth Circuit, for example, has held that a nonmoving party "cannot defeat a motion for summary judgment by submitting an affidavit [that] directly contradicts, without explanation, his previous testimony." *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984).  That court does not, however, permit a district court to strike or "disregard a party's affidavit merely because it conflicts *to some degree* with an earlier deposition." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893-94 (5th Cir. 1980) (holding that the district court erred in refusing to consider an affidavit that was "not inherently inconsistent" with the party's deposition testimony) (emphasis added).  Rather, the post-deposition affidavit should be considered unless "the issue raised by the contradictory affidavit constituted a sham." *Id.* at 894; *see also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (distinguishing *Bone* as a case in which the later affidavit "simply supplement[ed] the previous sworn deposition").

Other circuits likewise permit district courts to consider post-deposition affidavits that appear to contradict prior deposition testimony so long as the affidavit is not intended to create a sham issue of fact—that is, if the nonmoving party was confused during the deposition or has some other legitimate justification.  *See, e.g.*, *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (holding that a contradictory affidavit should be disregarded when it attempts to create a sham fact issue, and listing factors to be used in determining whether the affidavit creates such an issue); *Miller v. A.H. Robins, Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985) (holding that "an inconsistent affidavit may preclude summary judgment . . . if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony or if the affiant lacked access to material facts and the affidavit sets forth the newly-discovered evidence").  Both these rules and the exceptions thereto recognize, as the Tenth Circuit has cogently explained, "that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Franks*, 796 F.2d at 1237.

As we interpret *Reid* and the other relevant authorities, then, a district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony.  *See Albertson*, 749 F.2d at 228 (employing the "directly contradicts" language).  A directly contradictory

affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. *See A.H. Robins*, 766 F.2d at 1104 (setting forth instances in which "an inconsistent affidavit may preclude summary judgment"). If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue." *See Franks*, 796 F.2d at 1237. A useful starting point for this inquiry is the nonexhaustive list of factors articulated by the Tenth Circuit in *Franks*, where the court noted that the existence of a sham fact issue turns on "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id.*

The district court in the present case struck portions of Cosentini's affidavit that admittedly did not directly contradict his deposition testimony, but rather revealed information that was not fully explored during that testimony. *See Aerel*, 371 F. Supp. 2d at 942 (recognizing that paragraphs 7 and 11 did "not represent a direct contradiction between Cosentini's Affidavit and prior deposition testimony"). Absent a direct contradiction, as we have said, the district court should not have struck those two paragraphs unless they were added in an attempt to create a sham fact issue. But nothing in the record suggests that Cosentini attempted to "create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *See Franks*, 796 F.2d at 1237. The transcript of Cosentini's deposition testimony instead reveals that he was questioned about his understanding of the contract and that he referred to discussions with PCC Sales Director Alan Peterson, but that PCC's counsel quickly shifted the inquiry to topics other than Cosentini's discussions without fully exploring the issue. Paragraphs 7 and 11 of the affidavit are therefore properly viewed as an "attempt[] to explain" the oral understandings that were alluded to but not explored during the three-hour deposition. *See id.* (listing "whether the earlier testimony reflects confusion [that] the affidavit attempts to explain" as one factor in determining the existence of sham fact issue).

The district court's ruling, though consistent with the unpublished decisions of this court discussed above, therefore strikes us as a potentially significant extension of the principle announced in *Reid*—one that threatens to transform the straightforward, objective inquiry needed to decide whether an affidavit contradicts deposition testimony into a more subjective evaluation of a party's prior "opportunit[ies] during discovery to present evidence" and whether that party could have or should have been more forthcoming in her deposition. *See Lockard*, 52 F. App'x at 789. This court has not yet endorsed such an extension of *Reid* in any published decision, and we decline to do so today.

We do not need to decide, however, whether the district court's apparent extension of the *Reid* rule or its reliance on this court's unpublished decisions rose to the level of an abuse of discretion. This is because, even if the district court improperly applied that rule and should have accepted the affidavit in full, PCC was still entitled to summary judgment. *Cf. Lockard*, 52 F. App'x at 790 ("More importantly, even if the district court had acted improperly in granting [the defendant's] motion to strike, any error would not change the disposition of the present case.").

Under Ohio law, an oral modification to a written contract, other than a contract for the sale of goods, must be supported by additional consideration to be binding. *Valmac Industries, Inc. v. Ecotech Machinery, Inc.*, 738 N.E.2d 873, 875 (Ohio Ct. App. 2000) (applying this rule in assessing the validity of a forum-selection clause); *see also Richland Builders v. Thome*, 100 N.E.2d 433, 437 (Ohio Ct. App. 1950) ("An oral agreement, to have the effect to alter or modify the terms of a prior written contract, must be a valid and binding contract of itself, resting upon some new and distinct consideration."). Consideration is defined as "bargained for legal benefit and/or detriment." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (citation omitted). "[E]ither a detriment to the

promisee or a benefit to the promisor" suffices to establish consideration under Ohio law. *Ford v. Tandy Transp., Inc.*, 620 N.E.2d 996, 1009 (Ohio Ct. App. 1993).

In the present case, PCC's alleged post-signing promise to pay the disputed commissions is not supported by "new and distinct consideration." *See Richland Builders*, 100 N.E.2d at 437. The purported promise to pay was not exchanged for anything that benefitted PCC or caused a detriment to Aerel. *See Ford*, 620 N.E.2d at 1009. Instead, the promise—if in fact it was made—would constitute a one-sided deal in which PCC gratuitously agreed to pay additional commissions for services that Aerel had already agreed to provide in the written agreement. The result of such a deal would not have been "regarded by [PCC] as beneficial enough to induce [its] promise." *See Carlisle v. T & R Excavating, Inc.*, 704 N.E.2d 39, 43 (Ohio Ct. App. 1997) (holding that a husband's desire to help his wife's business in order to increase marital income did not constitute consideration). Aerel's oral-modification argument therefore fails as a matter of law, entitling PCC to summary judgment even if Cosentini's affidavit should have been admitted in its entirety.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.