NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0533n.06

No. 12-3835

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*May 31, 2013*
DEBORAH S. HUNT, Clerk

DONNA MARIE MANWARING,

   Plaintiff-Appellant,

v.

ERICK MARTINEZ; NELDA, LLC; NORTHERN
OHIO RESTAURANT GROUP, LLC,

   Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

O P I N I O N

BEFORE: NORRIS, COOK, and McKEAGUE, Circuit Judges.

  **McKEAGUE, Circuit Judge.** Donna Manwaring claims that Erick Martinez breached an agreement under which the two of them were to become co-owners in two companies created to own and operate Denny's Restaurant franchises. She asserts claims for breach of contract and promissory estoppel. The district court granted summary judgment in favor of the defendants (Erick and the two companies). It found that the alleged agreement was unenforceable because it fell within the one-year provision of Ohio's Statute of Frauds and was not memorialized in a sufficient writing. It further found that Donna had not identified the detrimental reliance necessary to create a genuine issue of material fact on her promissory estoppel claim. We vacate the district court's grant of summary judgment on the breach of contract claim and affirm the grant of summary judgment on the promissory estoppel claim.

## I. BACKGROUND

As alleged by Donna, the pertinent facts are these:

Donna and Erick both worked as executives for Denny's Corporation. In 2006, Donna and Erick began an intimate personal relationship during a business trip, although both were married to other people at the time. A month later, Donna was promoted and began reporting directly to Erick.

In the spring of 2007, Denny's informed some of its executives, including Donna and Erick, that it was developing a "franchise growth initiative" designed to shift ownership of a number of restaurants from the company to franchisees. The plan involved laying off employees and giving them the option of purchasing restaurants and becoming franchisees. Donna's responsibilities at Denny's included rolling out the franchise growth initiative and facilitating the transition process. Donna received a bonus for each restaurant she helped convert to a franchise.

As a result of the franchise growth initiative, Erick was laid off in September 2007. Donna learned that she also would eventually be laid off.

Sometime after learning about the franchise growth initiative, Donna and Erick met in Dallas, Texas, where Erick resided, and stayed together at a hotel. During their stay, they discussed their post-Denny's future. They talked about teaming up to take advantage of the franchise growth initiative and become Denny's franchisees. They decided to purchase restaurants in northern Ohio, because Donna had been supervising those restaurants and was familiar with them. They contemplated each owning 50% of any companies they would form to own and operate the restaurants. They contemplated sharing profits equally as equal co-owners. Due to Donna's continued employment with Denny's (and the corresponding conflict of interest), they decided that

- 2 -

her name would not be listed on any franchise proposals or operating agreements until after Donna ended her employment with Denny's.

Within a month of their Dallas rendezvous, Donna and Erick decided to implement their plan. As they had discussed in Dallas, they agreed that they would each own 50% of an entity set up to own and operate the restaurants. Erick would finance the undertaking while Donna would handle the day-to-day operations of the restaurants. They decided to retain as much of the earnings from the venture as possible to repay Erick's capital contributions and other debt and further agreed that until Erick recovered these contributions, Donna would not receive any compensation except as necessary to cover her living expenses. Erick promised to add Donna as an equal co-owner of the business after her employment with Denny's ended.

In October 2007, Donna and Erick met with an attorney to discuss forming a limited liability company. They explained that Donna's employment with Denny's precluded including her name on the operating agreement. A short time later, Donna and Erick returned to the attorney's office and formed NELDA, LLC.

Erick and Donna worked together to select restaurants, prepare franchise applications, and obtain financing. By the end of the year, the first four Denny's restaurants were transferred to NELDA. During the next six months, Donna managed the operations of the NELDA franchises while also working for Denny's. She communicated with the restaurant managers and vendors and made all operational decisions.

In June 2008, Donna was laid off. She did not look for another job because of her role with NELDA. After her layoff, Donna received substantial severance pay. She also received

unemployment benefits, which continued until February 2009. At first NELDA did not pay Donna a salary, but Erick covered some of her living expenses, and she had access to NELDA accounts for other personal expenses.

Shortly after Donna was laid off, she and Erick discussed acquiring an additional restaurant in Ohio and jointly developed a *pro forma* for the unit. Erick submitted the application individually on behalf of NELDA after insisting the acquisition process would proceed more efficiently this way. He promised to add Donna's name to NELDA's operating agreement as soon as the acquisition process was complete.

By May 2008, Donna and her husband had separated and planned to seek a divorce. Erick continued to delay adding Donna's name to NELDA's operating agreement, now expressing his concern that Donna's husband might pursue part of her interest were she listed as an owner. Purportedly based on similar concerns, Erick also removed Donna's name from NELDA's bank account and replaced it with the name of his wife, Ana Martinez, also telling Donna that he wanted his wife to have sufficient means to care for their daughter in the event of his death.

Donna's divorce was finalized in February 2009, and NELDA gave her $25,000 so she could pay off her husband's interest in their marital home. NELDA also began paying Donna a salary at this time.

In September 2009, Donna and Erick decided to acquire a new group of Denny's restaurants located in Flying J truck stops and, after consulting with NELDA's accountants, decided to form a new LLC to pursue this venture. They agreed that they would each own half of this new company. Erick contacted their attorney and set up a meeting to form Northern Ohio Restaurant Group

("NORG"), LLC.  Because Donna could not make the meeting, Erick met alone with the attorney and individually formed NORG, promising Donna that he would amend the operating agreement to include her 50% interest and at the same time amend NELDA's operating agreement.

Toward the end of 2009, the parties' professional relationship was deteriorating, although they continued their intimate relationship.  Donna had begun to suspect that Erick was lying about a number of aspects of their professional and personal relationships, including his purported separation from his wife.  They had several heated arguments, which culminated in a three-person telephone call in January 2010 between Donna, Erick, and Ana.  During this call, Erick told Donna she was "fired."

After this fallout, Erick continued to assist Donna financially from NELDA funds.  But the money dried up once Erick learned that Donna had hired an attorney to pursue legal recourse.

In January 2011, Donna sued Erick, NELDA, and NORG in Ohio state court.  The defendants removed the case to the United States District Court for the Northern District of Ohio.  By the time the defendants filed a motion for summary judgment, two claims remained: breach of contract and promissory estoppel.  The district court granted summary judgment for the defendants on both.  Donna timely appealed.

## II.  ANALYSIS

### A.  Standard of Review

We review *de novo* a district court's grant of summary judgment.  *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).  Summary judgement is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). When reviewing a grant of summary judgment, we must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B. The One-Year Provision of the Statute of Frauds**

The parties agree that Ohio law governs their dispute. The trickiest issue we must resolve is whether the parties' alleged agreement falls within the one-year provision of Ohio's Statute of Frauds. Under the one-year provision,

> [n]o action shall be brought whereby to charge the defendant . . . upon an agreement that is not to be performed within one year from the making thereof[] unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith . . . .

Ohio Rev. Code Ann. § 1335.05.

The district court concluded that the alleged agreement in this case fell within this provision of the Statute. In reaching this conclusion, we perceive that the district court made two errors: a factual error and a legal error. We begin with the factual error.

*1. Factual Error: Misapprehending the Alleged Agreement*

The parties disagree about the nature of the agreement Donna claims Erick breached. The district court referred to this agreement as a "partnership agreement." By doing so, Donna contends that it misapprehended the agreement.

Donna says she is not alleging that Erick breached a partnership agreement, but rather is alleging that he breached an agreement under which she was to become a co-owner of NELDA and NORG. In response, Erick contends that Donna "has tried to re-cast her breach of contract claim"

on appeal. Appellee Br. 17. He maintains that in the district court she described the agreement as

"an agreement that she *was* an owner of the companies," whereas on appeal she is now describing

the agreement as "a promise that she *would become* an owner of the companies." *Id.*

Viewing the alleged agreement as a partnership agreement, which is apparently how the

district court viewed it, makes little sense to us. Donna could hardly have taken the position that she

was an existing partner since NELDA and NORG are LLCs, not partnerships, and it is undisputed

that Erick is their sole member. Although her deposition testimony was not entirely clear, she

appears to have alleged relatively consistently that the agreement was for her and Erick to each own

50% of the companies they would create to operate Denny's restaurants.

In short, we view the alleged agreement in this case as an agreement to become the future co-

owners of companies created to operate Denny's franchises. Under this agreement, Erick was to be

listed as the initial owner and Donna was to be added as an equal co-owner later.

*2. Legal Error: Considering the Parties' Intent*

The district court also erred legally when in the course of its Statute of Frauds analysis it

considered Donna's intent that the parties' business relationship would last more than one year.

In 1995, the Ohio Supreme Court clearly and succinctly explained how to apply the one-year

provision of the Statute of Frauds:

> For over a century, the "not to be performed within one year" provision of the
> Statute of Frauds, in Ohio and elsewhere, has been given a literal and narrow
> construction. The provision applies only to *agreements which, by their terms, cannot
> be fully performed within a year*, and not to agreements which may possibly be
> performed within a year. Thus, where the time for performance under an agreement
> is indefinite, or is dependent upon a contingency which may or may not happen
> within a year, the agreement does not fall within the Statute of Frauds.

*Sherman v. Haines*, 652 N.E.2d 698, 700 (Ohio 1995) (emphasis added).

Under the approach described in *Sherman*, this case is easy; no *term* of the alleged agreement—no matter how it is viewed— *required* performance to last more than one year. But after quoting the applicable language from *Sherman*, the district court went on to consider "whether the parties intended the alleged agreement to last more than one year." R. 52, Order, PageID # 691. The district court said that if the parties intended their agreement to last more than one year, it would fall within the Statute. Because Donna said during her deposition that she was supposed to remain an owner of the company "indefinitely" and for "years and years," the district court found that "the parties intended the partnership to last more than one year," and concluded that the alleged agreement fell within the Statute. *Id.* at 691-92.

The district court believed that this approach was mandated by a recent decision from the Ohio Supreme Court: *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 909 N.E.2d 93 (Ohio 2009). In *Olympic Holding* the court confronted several issues arising out of an alleged joint venture agreement between a New York title reinsurance company and several Ohio title insurance companies. *Id.* at 95-96. The parties had exchanged several rounds of term sheets, but they had never prepared or signed a final written joint venture agreement. *Id.* at 96-97. The main issue in the case was "whether breaching a promise to execute an agreement equitably removes the agreement from the statute of frauds." *Id.* at 98-99. The court held that it does not. *Id.* at 100. It then went on to consider whether the alleged agreement fell within the one-year provision of the Statute of Frauds—a question that had not been resolved by the court below. *Id.* at 102. Its analysis of this issue spans only four sentences.

Although *Sherman* was the last time the Ohio Supreme Court had applied the one-year provision and contains the court's clearest explanation of that provision, in *Olympic Holding* the court did not mention *Sherman*. Instead the court cited two cases—an opinion from the Northern District of Ohio and an unreported opinion from an Ohio Court of Appeals—for the proposition that "[w]hen parties to an alleged agreement did *not* intend the agreement to be performed in less than a year, the statute of frauds renders that agreement unenforceable." *Id.* The court concluded that since "the parties envisioned that the proposed joint venture agreement would last five years," it fell within the Statute of Frauds. *Id.*

The Ohio Supreme Court's language in *Olympic Holding* is problematic. By indicating that courts should consider the parties' intent, the court's opinion in *Olympic Holding* appears to conflict with its opinion in *Sherman*, where the court emphasized that the one year provision is construed narrowly and "applies only to agreements which, by their terms, cannot be fully performed within a year." *Sherman*, 652 N.E.2d at 700. However, in our view the conflict is only superficial, as we will explain below.

To appreciate the problem with the court's language in *Olympic Holding*, we think it is instructive to consider in some detail a venerable United States Supreme Court case the court cited in *Sherman*. In *Warner v. Texas & Pacific Railway Company*, the Supreme Court applied the one-year provision of Texas's Statute of Frauds, which was essentially identical to Ohio's. 164 U.S. 418, 420 (1896).

Warner was a lumberman who entered into an oral contract with a railroad. *Id.* at 419. He had located the perfect spot for a sawmill, but it was three miles from the nearest railway. *Id.* The

railroad agreed that if Warner graded the ground and laid the railroad ties, it would lay the rails to extend a "switch" to his sawmill and would maintain the switch as long as he needed it. *Id.* Warner graded the ground and laid the ties, the railroad laid the rails, and for many years Warner shipped his lumber via the switch. *Id.* Warner testified that he expected to operate the sawmill for more than a year and indeed intended to remain there for the rest of his life. *Id.* at 419-20. He told the railroad's agent that there was enough timber in the vicinity to keep his sawmill busy for thirty years. *Id.* at 420.

After thirteen years the railroad destroyed the switch. *Id.* at 419. Warner sued for breach of contract. *Id.* at 418. The Fifth Circuit held that the parties' oral agreement was within the one-year provision of Texas's Statute of Frauds and was unenforceable. *Id.* at 420.

The Supreme Court reversed. It spent several pages discussing cases both from England and the United States that had construed the one-year provision. *Id.* at 421-33. It then applied the principles gleaned from those cases and concluded that the agreement to maintain the switch did not fall within the one-year provision since its terms did not require it to last longer than a year and the contract could have terminated within a year if Warner had died or otherwise stopped needing the switch within that time. *Id.* at 434-35. The parties' intent that the contract continue for more than a year and the likelihood that it would do so were irrelevant because the parties "made no stipulation which, in terms, or by reasonable inference, *required* that result." *Id.* at 434 (emphasis added). According to the Supreme Court, when applying the one-year provision "[t]he question is not what that probable, or expected, or actual performance of the contract was, but whether the contract,

*according to the reasonable interpretation of its terms, required* that it should not be performed within the year." *Id.* (emphasis added).

Under *Sherman* and *Warner*, the alleged agreement in this case—even as it was construed by the district court—falls outside the one-year provision of the Statute of Frauds. Donna's intent as to the duration of the business relationship is irrelevant. No *term* of the alleged agreement *required* that any aspect of performance extend beyond a year. Just as Warner could have stopped needing the switch within one year, the parties here could have dissolved the companies or Donna could have sold her interest within one year, rendering the contract fully performed within that time.

Commentators have recognized that considering the parties' intent when applying the Statute of Frauds is "not in accord with the trend of authority" and "should not be approved." 4-19 *Corbin on Contracts* § 19.3 (2012); *see also* Richard A. Lord, *Williston on Contracts* § 24:1 (4th ed. 2013) (describing this approach as "contrary to the great weight of authority"). We recognize that some Ohio Courts of Appeals have apparently adopted the intent approach. *See Lingo v. Ohio Cent. R.R.*, 2006 WL 1230679, at *11 (Ohio Ct. App. 2006); *Mills v. Mills*, 127 N.E.2d 222, 223-24 (Ohio Ct. App. 1952). We cannot disregard these cases, but we believe that the Ohio Supreme Court would not follow their approach. *See West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."). These cases are inconsistent with *Sherman* and not in keeping with the generally accepted approach to the Statute of Frauds.

Unlike the district court, we do not read *Olympic Holding* as directing us to depart from the majority approach to the Statute of Frauds. It seems incredible that in merely four sentences and with no explanation, the Ohio Supreme Court would depart from the standard approach to the Statute of Frauds, an approach it had earlier approved in *Sherman*. Furthermore, although in *Olympic Holding* the court cited two cases that considered the parties' intent, *Olympic Holding* is easily distinguished from those cases and reconciled with *Sherman* and *Warner*. In *Olympic Holding*, one of the agreement's terms was that the joint venture would last for five years. The agreement was a contract that *by its terms* could not be performed within a year. As such, it of course fell within the Statute. The court's reference to the parties' intent is best interpreted to mean their intent that was expressed as a term of their oral contract. *Olympic Holding* does not require us to depart from the approach clearly explained in *Sherman*.

In sum, the district court committed both a factual error and a legal error in its application of the one-year provision of the Statute of Frauds. It erred factually when it construed the alleged agreement as a partnership agreement rather than as an agreement to become co-owners in future companies. It erred legally when it considered Donna's intent to determine whether the agreement fell within the one-year provision of the Statute of Frauds. Because the alleged agreement to become co-owners did not by its terms require any aspect of performance to last beyond a year, it is not within the Statute of Frauds.

## C. Certainty

Invoking the rule that this Court can affirm based on any ground supported by the record, Erick contends that the alleged agreement is not enforceable "because there was no meeting of the

minds between the parties as to the essential terms of an agreement." Appellee Br. 22-23. Because the district court found the alleged agreement unenforceable under the Statute of Frauds, it did not reach this issue. Although he discusses Ohio's "meeting of the minds" requirement at length, the thrust of Erick's argument appears to be directed toward what he believes is a lack of definiteness in the alleged agreement. His basic contention is that in her deposition Donna did not identify enough specific terms to constitute an enforceable agreement. He identifies a whole litany of what he believes are important terms that she left out. In response, Donna points out that Erick's brief completely ignores the contractual terms she identified in her affidavit.

For an agreement to be enforceable, its terms must be "definite and certain." *See Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Relations*, 575 N.E.2d 134, 137 (Ohio 1991). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33 (1981). In her affidavit, Donna alleged that she and Erick agreed to each own half of a company they would set up to operate Denny's franchises. Erick was to provide the capital and she was to handle the operations. Until Erick recouped his capital contributions and the company paid down its loans, Donna would only receive enough money for living expenses. Then they would share equally in the profits. Donna would be added to the company's operating agreement after Denny's terminated her employment. R. 45-1, Affidavit, PageID # 334-335, 352.

Although Erick is correct that Donna did not identify all the terms that could be included in a formal partnership agreement, she is alleging that he breached an agreement to be co-owners in a future company, not that he breached an existing partnership agreement. She identified the

agreement's terms with sufficient certainty to determine whether Erick breached the agreement and to select an appropriate remedy. The alleged agreement is not unenforceable on the ground of indefiniteness.

## D. Promissory Estoppel

Donna asserted a claim for promissory estoppel in addition to her claim for breach of contract. "The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice." *Olympic Holding*, 909 N.E.2d at 100 (quotation omitted). "To be successful on a claim of promissory estoppel, the party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." *Id.* at 101 (quotations omitted). If Donna loses on her breach of contract claim, she seeks to recover on her promissory estoppel claim.

The district court found that Donna failed to produce evidence showing that she detrimentally relied on Erick's promise to make her a co-owner of NELDA and NORG. On appeal, Donna points to four ways in which she believes she can show detrimental reliance. We address them each in turn.

### 1. Contribution of Bonuses to NELDA

Donna contends that she detrimentally relied on Erick's promises by contributing to NELDA approximately $18,000 in bonuses she received for her work during Denny's franchise growth initiative. These bonuses were deposited into Donna's bank account, which Erick controlled. In her affidavit (which was prepared after Erick filed his motion for summary judgment) Donna said both

that "upon information and belief, I believe that these bonuses were contributed to Nelda" and that "[i]n fact, I contributed my FGI bonuses" to NELDA. R. 45-1, Affidavit, PageID # 334, 351. The district court refused to consider these statements, finding that they directly contradicted statements she made during her deposition.

Donna contends that the district court erred in not considering the statements in her affidavit as evidence of detrimental reliance. We review for an abuse of discretion a district court's decision to strike statements in a post-summary-judgment-motion affidavit for being contradictory to an earlier deposition. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* at 908.

The district court correctly found that Donna's affidavit contradicted her deposition. During her deposition she said that her bonuses "were to be contributed to NELDA." R. 46, Deposition, PageID # 499. But she then admitted that she had "no idea" if she contributed all her bonuses to NELDA; had no knowledge if any of the bonuses were used for NELDA expenses or obligations; had no reason to believe that any of the bonuses were spent for NELDA purposes; had not seen anything that would indicate that any of the bonuses were spent for NELDA purposes; and was not aware of any documents that would demonstrate that the bonuses were contributed to NELDA. *Id.* at # 499-500. She also said that she could not testify that she made any financial investments in NELDA. *Id.* at 501.

Donna feebly asserts that it was not directly contradictory for her to say in her deposition that she did not know whether any of her bonuses went to NELDA and then later maintain that her

bonuses were contributed to NELDA. Apparently she believes a direct contradiction would exist only if she had explicitly said in her deposition that her bonuses were *not* contributed to NELDA. But even assuming that a direct contradiction did not exist, a district court can also disregard a statement in an affidavit if "the court determines that the affidavit constitutes an attempt to create a sham fact issue." *Aerel, S.R.L*, 448 F.3d at 908 (quotation omitted). Since Donna has not even attempted to explain what additional information she acquired post-deposition that caused her to believe her bonuses went to NELDA, the district court was within its discretion in disregarding these statements. Donna cannot rely on the bonuses as evidence that she detrimentally relied on Erick's promises.

### 2. Work for NELDA <u>Before</u> Layoff

Donna argues that the work she performed for NELDA before she was laid off by Denny's shows detrimental reliance on Erick's promises. The district court found that this work did not constitute detrimental reliance because Denny's was paying her to perform this work and was even giving her bonuses for transferring the restaurants to franchisees. Donna contends that the district court misunderstood her argument on this point. She points to a statement in her deposition that her work for NELDA "went beyond" her responsibilities at Denny's. *See* R. 46, Deposition, PageID # 476. She also points to statements in her affidavit which indicate that she worked hard for NELDA for six months after the transition to franchises was complete. *See* R. 45-1, Affidavit, PageID # 337-38.

Even assuming that Donna's work for NELDA went beyond her responsibilities at Denny's, the record indicates that she benefitted from it. She stated in her deposition that Erick began giving

her money from NELDA's accounts before she was laid off by Denny's. R. 46, Deposition, PageID # 510. She could draw money from NELDA's accounts whenever she needed it. She had debit cards, check books, the ability to transfer funds. In short, she had "all the access in the world" to NELDA's accounts. *Id.* at 509. She evidently used NELDA funds to pay for personal expenses. *Id.* at 510. NELDA funds financed her and Erick's vacations and gambling excursions. *Id.* All these benefits flowing from her association with NELDA necessarily prevent Donna from showing that her reliance on Erick's promises before her layoff was detrimental.

### 3. *Work for NELDA After Layoff*

Donna further maintains that her work for NELDA after she was laid off by Denny's constitutes detrimental reliance. The district court found that she could not show a "'sufficiently definite' and 'substantial' detriment during this time." R. 52, Order, PageID # 694. It pointed to her severance package from Denny's, her unemployment benefits, and the money she received from NELDA to support this conclusion.

It was not proper for the district court to take into account either Donna's severance package or her unemployment benefits. She would have received these regardless of her work for NELDA. Therefore, we will consider only the money she received from NELDA to ascertain whether she can show that her reliance on Erick's promises after her layoff was detrimental.

Donna was laid off in June 2008. Although she had unlimited access to NELDA's bank accounts, she received no salary from NELDA until March 2009. At that time Erick established a salary for her that was officially stated as $110,000, but which Donna says was actually only $40,000. Also around this time, NELDA paid Donna $25,000 so she could pay off her husband's

interest in their marital home.  NELDA leased a Lexus for her to drive.  Erick paid her landscaper in 2010.  Donna's affidavit says that she received a total of $102,648.40 from NELDA in 2009 and $5,175[1] in 2010.  R. 45-1, Affidavit, PageID # 353.

Because of the substantial compensation and other perks Donna received, the district court was correct to conclude that she has not produced evidence of detrimental reliance after being laid off from Denny's.  Any reliance was to her benefit, not to her detriment.

*4.  Failure to Seek Other Employment*

Donna contends that she detrimentally relied on Erick's promises by not seeking other employment or business opportunities.  The district court concluded that "the mere failure to seek other employment is not sufficient to establish detrimental reliance."  R. 52, Order, PageID # 694 (citing *Wing v. Anchor Media, Ltd. of Texas*, 570 N.E.2d 1095, 1099 (Ohio 1991) (at-will employee's turning down other job opportunities in reliance on a promised opportunity to purchase equity in the company "[did] not present a jury question of substantial detrimental reliance")); *see also Lake v. Wolff Bros. Supply, Inc.*, 1993 WL 462866, at *6-7 (Ohio Ct. App. 1993) (at-will employee could not show detrimental reliance when he did not assert that he turned down other employment opportunities in reliance on an alleged promise of a specific employment term).  Donna suggests no authority to the contrary.

---

[1]Earlier in her affidavit she says that Erick sent her $8,000 in NELDA funds after he "fired" her in January 2010.  *Id.* at PageID # 350.

In sum, the record indicates that Donna relied on Erick's promises, but the reliance was beneficial, not detrimental. We therefore affirm the district court's grant of summary judgment on Donna's promissory estoppel claim.

## V.  CONCLUSION

We **VACATE** the district court's grant of summary judgment on Donna's breach of contract claim. We **AFFIRM** the district court's grant of summary judgment on Donna's promissory estoppel claim. Because we are vacating the district court's grant of summary judgment on Donna's breach of contract claim, we **VACATE** the district court's order granting costs to Erick for expenses relating to Donna's depositions.