NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0055n.06

No. 19-4233

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jan 27, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ENTECH, LTD., | ) | |
|     Plaintiff - Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MARCIA SPEECE, | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
|     Defendant - Appellee. | ) | |
| | ) | **OPINION** |
| | ) | |

Before:   **MERRITT, MOORE, and GIBBONS, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.**   Plaintiff EnTech, LTD. ("EnTech")

appeals from a judgment entered against it after the district court granted Defendant Marcia

Speece's motion for summary judgment and from the district court's order imposing Rule 11

sanctions upon it.   Because there is a genuine dispute of material fact as to EnTech's claims

brought under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and state law,

and because EnTech reasonably pursued its claims, we **REVERSE** the district court on both fronts

and **REMAND** the case for further proceedings.

## I.   BACKGROUND

This case concerns an EnTech computer that Marcia Speece allegedly—either alone or in

concert with her son Iain Speece—removed from the home she shared with her now-estranged

husband, Bryan Speece (EnTech's owner).   We will refer to the various Speeces by their first

names in this opinion to avoid confusion.

Bryan founded EnTech in 2004 to "promote highly specialized software to enhance the operation of intelligent displays," for example, computer monitors. R. 54-1 (B. Speece Aff. at ¶ 5) (Page ID #808). Among other things, Bryan's EnTech work involved testing prototype displays provided by third-parties. *Id.* at ¶ 11 (Page ID #809–10). EnTech was not just Bryan's domain—it was a family affair. Marcia served as EnTech's bookkeeper from its inception until the couple separated, *id.* at ¶ 23 (Page ID #814), and Janet Speece, Bryan's mother, has served as its in-house counsel, R. 54-4 (J. Speece Aff. at ¶ 2) (Page ID #955). Indeed, Bryan did much of his work for EnTech on a computer located in his basement office in the Speeces' Chagrin Falls home. R. 54-1 (B. Speece Aff. at ¶¶ 13–18) (Page ID #810–12).

Bryan built his EnTech work computer himself and upgraded it in 2013 with parts that he mostly purchased from a retail computer store, Micro Center. *Id.* In particular, Bryan installed a "120 gigabyte solid state drive" and an additional "rotating hard drive," the latter of which held data copied over from the earlier iteration of Bryan's work computer. *Id.* at ¶¶ 15, 17–18 (Page ID #811–12). These and the other computing components were housed in a relatively generic "black tower enclosure[]," and, together with a prototype thirty-inch Dell monitor, constitute the computer system at issue, *id.* at ¶¶18, 20 (Page ID #812), which we will henceforth refer to as the "EnTech Computer."

The EnTech Computer is not to be confused with a computer that Iain used for playing video games ("Iain's Computer"). Iain's computer was located around the corner from Bryan's office, in a corner of the Speeces' basement that the Parties refer to as Iain's "Sanctum." *Id.* at ¶ 21 (Page ID #813). Iain and Bryan built Iain's Computer together around the same time that Bryan upgraded the EnTech Computer, but used components purchased online, not at Micro

Center. *Id.* at ¶¶ 13–14 (Page ID #810); R. 50-2 (I. Speece Dep. at 37–39) (Page ID #614). Although similar in some respects, Iain's Computer was built from different components and was housed in a smaller black tower that had additional venting. R. 54-1 (B. Speece Aff. at ¶ 20) (Page ID #812–13).

On May 30, 2015, Marcia took the Speeces' two children and moved out, having filed for divorce the day before. *Id.* at ¶ 23–24 (Page ID #814); R. 50-1 (Divorce Dkt. at 1) (Page ID #574). Bryan claims that he was ill at the time, was unaware that his family was leaving, and did not see them packing. R. 54-1 (B. Speece Aff. at ¶ 24) (Page ID #814). He also claims that "soon after" Marcia and the children's departure, he noticed that both the EnTech Computer and Iain's Computer were missing from the basement. *Id.* at ¶ 25 (Page ID #814). On June 19, 2015, Bryan emailed Marcia and informed her that Iain "took a computer system and monitor that belong to my business" and that Iain needed to "contact [Bryan] immediately to return those items." *Id.*, Ex. 10 (emails) (Page ID #861).

Earlier on June 19th, and unbeknownst to Bryan, Iain had returned to the Speeces' Chagrin Falls home to pick up some belongings. R. 54-4 (J. Speece Aff. at ¶¶ 17–21) (Page ID #958–59); *see* R. 54-1 (B. Speece Aff. at ¶¶ 28–29) (Page ID #815–16). There, Iain encountered Janet and his grandfather (Bryan's father), Peter Speece. R. 54-4 (J. Speece Aff. at ¶¶ 19–20) (Page ID #958–59). According to Janet, whose affidavit EnTech filed in opposition to Marcia's motion for summary judgment, Janet informed Iain that Bryan was "particularly concerned about the [EnTech] computer and monitor that had been taken from [Bryan's] office." *Id.* at ¶ 22 (Page ID #959). Janet then asked Iain if he had taken that equipment, to which—according to Janet—Iain responded that "his mother wanted it and had told him to take it" and that "they had loaded it into

3

the car the day they left." *Id.* When Janet told Iain that Bryan needed that equipment back immediately, "Iain said it wasn't up to him, that [Marcia] was the one who had that equipment, and if [Bryan] wanted to try and get any of it back he'd have to talk to [Marcia] about it." *Id.* Iain, for his part, testified at his deposition that he did not think that his grandmother mentioned his taking a business computer during the encounter and that he does not remember whether he had any conversation with his mother about what computer equipment to take from the home when they moved out. *See* R. 50-2 (I. Speece Dep. at 73, 82–83) (Page ID #623, 625).

On June 30, 2015, Bryan followed up with another email, this time to Marcia and Iain. In it, Bryan demanded the "immediate return" of the "equipment belonging to my business," describing a "prototype" monitor and computer system that was "hand-built by me for analysis and testing purposes." R. 54-1 (B. Speece Aff., Ex. 11) (Page ID #863). Marcia responded on July 2, 2015, telling Bryan that "[t]he computer system that you have requested to be returned to you has been secured at my attorney's office" and that Bryan could contact her attorney to "facilitate the transfer" of the computer. *Id.*, Ex. 12 (Page ID #865).

When Bryan went to collect the computer from Marcia's divorce counsel on July 9, 2015, he "was relieved to see that the EnTech Computer with its [] large monitor [was] present there." *Id.* at ¶33 (Page ID #817). Bryan recognized the EnTech Computer from the size of its tower enclosure and the thirty-inch prototype Dell monitor. *Id.* It was not until Bryan set up the computer at his parents' home that he noticed that

> a high-powered graphic card had been replaced with an entry level one, and that the rotating hard drive had been removed altogether. This was very disheartening as the key data had been present on that drive. The smaller solid state drive was still there and appeared to be physically intact, but the machine would not read from it.

*Id.* at ¶ 34 (Page ID #817–18). As a result, Bryan claims to have lost test data stored on the EnTech Computer and "confidential information and documents of third-party entities protected under NDA including charts and tables." *Id.* at ¶¶ 27, 34–35 (Page ID #815, 817–18). To reproduce the lost test data, Bryan—who was "unable to keep [his] mind focused at that time"—hired his father, Peter, paying him $30,000 for the work, which took 3 months, and $15,000 for rent because the work took place at Peter's home. *Id.* at ¶¶ 35–36 (Page ID #818–19). Bryan claims that during the couple's divorce proceedings, Marcia's divorce counsel referenced materials and confidential information that Bryan claims would have been from the EnTech Computer. *Id.* at ¶¶ 43, 45–46 (Page ID #821–22); *see also* R. 54-6 (J. Heutsche Aff.) (Page ID #997–1000).

Marcia and Iain, for their part, maintain that Iain removed Iain's Computer from Iain's Sanctum—but not the EnTech Computer from Bryan's office—when they moved out on May 30, 2015. R. 50-3 (M. Speece Dep. at 77–79) (Page ID #666–67); R. 50-2 (I. Speece Dep. at 73–74) (Page ID #623). Both were deposed for this case and testified that this computer—Iain's Computer—was the one delivered to Marcia's divorce counsel for Bryan to pick up. R. 50-3 (M. Speece Dep. at 94–95) (Page ID #671); R. 50-2 (I. Speece Dep. at 117–18) (Page ID #634). Iain explained that prior to returning the computer, he purchased parts for and built a new computer for himself and transferred personal data from his computer onto a new hard drive. R. 50-2 (I. Speece Dep. 89–97) (Page ID #627–29). Iain also explained that he switched out the graphics card that was installed in the computer before it was delivered to Marcia's divorce counsel. *Id.* at 65, 105–107 (Page ID #621, 631).

EnTech filed suit on June 20, 2016, alleging one claim each for a violation of the CFAA, replevin, conversion, and civil conspiracy based on the allegation that Marcia—alone or with

unnamed coconspirators—removed the EnTech Computer from the Speeces' home, accessed it, and "obtained information and/or caused damage and loss" to it.  R. 1 (Complaint at ¶ 37) (Page ID #5).  On November 2, 2018, Marcia moved for summary judgment on the ground that EnTech's claims lacked evidentiary support and for sanctions under Rule 11.[1]  Her motions argued that Iain's Computer was the only computer removed from the Speeces' home, that Iain, not Marcia, accessed that computer, which did not contain EnTech business information, and that neither she nor her divorce counsel possessed EnTech's confidential information.  EnTech opposed both motions, arguing—based primarily on Bryan's and Janet's affidavits—that it was the EnTech Computer, not Iain's Computer, that Bryan recovered from Marcia's divorce counsel, that the EnTech Computer was returned with one hard drive wiped of data and another missing, and that this was attributable to Marcia directly or by way of Iain or Marcia's divorce counsel as unnamed co-conspirators.   In support, EnTech also filed an expert report by a computer forensics firm, which matched components in the computer that EnTech purported to be the one that Bryan recovered from Marcia's divorce counsel to an April 2013 Micro Center receipt that Bryan provided.  R. 54-7 (Vestige Report at 5) (Page ID #1010).  The report also concluded that the computer's solid state drive had been "completely wiped."  *Id.*  Marcia moved to strike Bryan's and Janet's affidavits as attempts to create a "sham" issue of fact.   R. 64 (Mot. Strike at 1–2) (Page ID #1431–32).

The district court granted Marcia's summary judgment motion on the papers, concluding that "[t]he complete lack of evidentiary support for the claim that Marcia Speece accessed the

---

[1] EnTech asserts that Marcia did not conduct any affirmative discovery before filing these motions, Appellant's Reply at 13, and this appears to be true.

computer is fatal to all of EnTech's claims." *EnTech, LTD. v. Speece*, 5:16-CV-1541, 2019 WL 6051531, at *3 (N.D. Ohio Nov. 15, 2019). The district court did not rule on Marcia's motion to strike, but ruled sua sponte that Janet's affidavit contained hearsay that would be inadmissible at trial and thus disregarded it. *See id.* at *2. Concluding that it was unreasonable for EnTech to continue to pursue litigation after the depositions of Marcia and Iain—the point at which EnTech, according to the district court, should have realized it could not support its claims with evidence— the district court sanctioned EnTech pursuant to Federal Rule of Civil Procedure 11. *Id.* at *5. This appeal followed.

## II.  SUMMARY JUDGMENT

### A.  Standard of Review

"This court reviews de novo the district court's grant of summary judgment." *Garretson v. City of Madison Heights*, 407 F.3d 789, 795 (6th Cir. 2005). "A grant of summary judgment will be upheld only where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law." *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567, 570 (6th Cir. 2020) (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)), *petition for cert. filed* (Nov. 25, 2020). To establish the existence of a genuine dispute of material fact, the plaintiff must present "evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (per curiam). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 591–92 (6th Cir. 2001).

**B. EnTech's Affidavits**

Initially, the parties dispute whether Bryan's and Janet's affidavits should have been considered by the district court and whether they should be considered here. EnTech argues that the district court incorrectly rejected Janet's affidavit as presenting inadmissible hearsay, Appellant's Br. at 41–47, and Marcia—ignoring the hearsay issue—insists that both affidavits are "sham" affidavits that should be disregarded, Appellee's Br. at 27–31. We agree with EnTech that the district court improperly declined to consider Janet's affidavit on hearsay grounds, and that it was otherwise appropriate for the district court to consider her affidavit along with Bryan's.

*Hearsay.* The district court ruled sua sponte that Janet's affidavit—to the extent that it recounted her conversation with Iain, who Janet says told her that Marcia had told Iain to take the EnTech Computer—contained inadmissible hearsay, and declined to consider it in ruling on Marcia's motions. A district court's "conclusions of law, such as whether proffered evidence constitutes hearsay within the meaning of the Federal Rules of Evidence, are reviewed *de novo*." *Hancock v. Dodson*, 958 F.2d 1367, 1371 (6th Cir. 1992). Because the offending portion of Janet's affidavit contains one out of court statement nested within another—Marcia's out of court statement to Iain, which Iain in turn relayed to Janet—it presents a possible double hearsay issue. *See* Fed. R. Evid. 805. However, Marcia's statement is not hearsay under the exclusion for statements made by a party opponent, *see* Fed. R. Evid. 801(d)(2)(A), and thus the key question is whether Iain's statement is inadmissible hearsay.

We conclude that Iain's out of court statement is admissible under at least three exclusions from or exceptions to the hearsay rule. First, Iain's statement is admissible as the statement of a co-conspirator. *See* Fed. R. Evid. 801(d)(2)(E). As explained in more detail below, there is a

genuine dispute of fact as to whether Marcia and Iain formed a conspiracy to dispossess EnTech of the EnTech Computer. *See* Section II.D, *infra*. Moreover, Iain's statement was made "in furtherance of the conspiracy," Fed. R. Evid. 801(d)(2)(E), insofar as it promoted the conspiracy's objectives by delaying the return of the EnTech Computer, *see United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989), and identified another member of the conspiracy (Marcia) and her role, *see United States v. Brown*, 221 F.3d 1336, 2000 WL 876382, at *8 (6th Cir. 2000) (unpublished table decision). Second, and similarly, Iain's statement is admissible as that of Marcia's agent, insofar as Iain acted on Marcia's behalf and under her direction in taking the EnTech Computer and made his statement in the course of that relationship. *See* Fed. R. Evid. 801(d)(2)(D); *Nicholas v. Standard Ins.*, 48 F. App'x 557, 563, n.1 (6th Cir. 2002) ("An agency relationship arises as 'the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control and that the other consents to do so.'" (quoting Restatement (Second) of Agency § 1, cmt. a (1958))). Third, Iain's statement is a statement against interest. Under Federal Rule of Evidence 804(b)(3)(A), an unavailable witness's out of court statement is admissible hearsay if it "had so great a tendency to . . . expose the declarant to civil or criminal liability" such that "a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true." *Id.* Iain qualifies as unavailable because he does not remember the subject matter of his statement—his conversation with Marcia—and the statement could have exposed Iain to liability for theft or conversion of the EnTech Computer, as examples. Accordingly, the district court erred in disregarding the out of court statements presented in Janet's affidavit.

***Sham Affidavits.*** Marcia argues that we should disregard Bryan's and Janet's affidavits because they are "shams" designed to create a false issue of material fact. Under the sham affidavit doctrine, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). But this rule is strictly curtailed and generally applies only where the affiant "directly contradicts" their prior sworn testimony. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). Indeed, this court applies a "relatively narrow definition of a contradiction." *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006). Where there is no direct contradiction, "then the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Aerel*, 448 F.3d at 908 (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

As a matter of the record, Marcia is wrong insofar as she suggests that the district court in fact disregarded Bryan's and Janet's affidavits as shams. To the contrary, the district court did not rule on Marcia's motion to strike the affidavits, and appears to have considered them—aside from the portion of Janet's it considered hearsay—in ruling on her other motions. We perceive no abuse of discretion in the district court's decision to consider the affidavits and see no reason to disregard them here. *See Aerel*, 448 F.3d at 906.

Beginning with Bryan's affidavit, Marcia argues that it directly contradicts two pieces of Bryan's testimony in their divorce proceedings. Even on the assumption that it would be appropriate to consider testimony from a separate proceeding to determine whether Bryan's affidavit is a sham, there is no contradiction that would support that conclusion. Marcia points

first to Bryan's divorce deposition, where he testified that "the machine that was returned to me has a functioning hard drive," apparently in reference to the computer he recovered from Marcia's divorce attorneys. R. 60-1 (B. Speece State Ct. Dep. at 263) (Page ID #1099). This statement comes from a lengthy line of questioning about Bryan's physical destruction of other EnTech hard drives and came in response to a question about whether there were any business hard drives that were not physically "destroyed." *Id.* In this context, Bryan's divorce deposition testimony that the EnTech computer he received from Marcia's divorce counsel had a "functional" hard drive, is best understood as meaning the intact hard drive was physically undamaged. This is fully consistent with Bryan's affidavit attestation that when he recovered the EnTech Computer the remaining drive was "physically intact." R. 54-1 (B. Speece Aff. at ¶ 34) (Page ID #818). Moreover, although Bryan attests in the affidavit that the computer "would not read from" the remaining drive, *id.*, this was likely because it had no data on it—the drive could still have been "functioning" in the sense that it could be read with new data stored on it.

Next, Marcia points to Bryan's testimony before the divorce court, that when he recovered the EnTech Computer from Marcia's divorce counsel "[i]t was a little bit dismantled but . . . all the parts that counted were there." R. 60-2 (B. Speece Test. at 1245) (Page ID #1268). To Marcia, this contradicts Bryan's affidavit attestation that the EnTech Computer was returned with its rotating hard drive missing. Without a clear explanation for what Bryan meant by "the parts that counted," it is hard to say whether this statement would have included the rotating hard drive. Because Bryan was not expressly asked whether the EnTech Computer was returned with its rotating hard drive, his affidavit is better understood to have "fill[ed] a gap" in his earlier testimony by explaining that the rotating drive was not a part that "counted," such that his affidavit is not

11

contradictory. *Aerel*, 448 F.3d at 907. Accordingly, because the record does not otherwise establish that Bryan's affidavit is a sham, the district court was free to consider Bryan's affidavit, as are we on appeal.

As for Janet's affidavit, Marcia's bare assertion that it is a sham can be easily disposed of. Marcia points to no prior testimony that Janet's affidavit could contradict, and the record does not otherwise suggest that it constitutes an attempt to create a sham issue of fact. Thus, we are free to consider Janet's affidavit here, along with Bryan's.

## C. EnTech's CFAA Claim

With those preliminary matters behind us, we turn to the merits of EnTech's CFAA claim. EnTech's CFAA claim invokes at least § 1030(a)(2)(C). To recover under that provision, a plaintiff must prove that: (1) the defendant intentionally accessed a "protected computer"; (2) the access was "unauthorized" or in excess of authorization; (3) through the unauthorized access, the defendant "obtained information" from the computer; and (4) the conduct caused one or more persons "loss" during any one-year period aggregating at least $5,000. 18 U.S.C. § 1030(a)(2)(C); *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 759 (6th Cir. 2020) *petition for cert. filed* (Sept. 26, 2020). Marcia does not contest § 1030(a)(2)(C)'s second and fourth elements,[2] and she does not contest that the EnTech Computer qualifies as a "protected computer" within the meaning of the statute. Thus, the question is simply whether EnTech has

---

[2]Indeed, Marcia does not expressly address the elements of § 1030(a)(2)(C) at all. Instead, both here and below, Marcia's CFAA arguments focused on § 1030(a)(4), a distinct provision with its own elements. Marcia's decision to address § 1030(a)(4) and not the provision that EnTech actually invoked is difficult to understand given that EnTech does not appear ever to have represented that it sought relief under that provision. Nevertheless, to the extent that Marcia's arguments are relevant to a claim brought under § 1030(a)(2)(C), we address them here.

established a genuine issue of fact as to whether Marcia accessed the EnTech Computer and obtained information from it.

Marcia's first argument on appeal is that she could not have accessed the EnTech Computer because she was never in possession of it. By Marcia's telling, Iain took his own computer with him when they moved out, and the two left the EnTech Computer where it was. Whatever the merits of this narrative may be at trial, it fails as a summary judgment theory. EnTech presented ample evidence from which a jury could infer that it was in fact the EnTech Computer—not Iain's or some other computer—that Marcia provided her divorce counsel and that Bryan recovered. Specifically, EnTech offered:

- A June 19, 2015 email from Bryan to Marcia in which Bryan states that Iain "took a computer system and monitor that belong to my business" and needed to contact Bryan to return those items. R. 54-1 (B. Speece Aff., Ex. 10) (Page ID #861).
- A June 30, 2015 email from Bryan to Marcia and Iain requesting the "immediate return of the equipment belonging to my business which you took on May 30th," describing a "prototype" monitor and "computer system . . . hand-built by me for analysis and testing purposes." *Id.*, Ex. 11 (Page ID #863).
- Marcia's July 2, 2015 reply to Bryan's June 30th email, informing Bryan that "[t]he computer system that you have requested to be returned to you has been secured at my attorney's office" for Bryan to pick up. *Id.*, Ex. 12 (Page ID #865).

A reasonable juror could find that the computer referenced in these emails was the EnTech Computer, and thus that Marcia was in possession of the EnTech Computer before leaving it with her divorce counsel. Janet's attestation that Iain acknowledged taking the computer from Bryan's office, only supports this conclusion. *See* R. 54-4 (J. Speece Aff. at ¶¶ 17–21) (Page ID #958–59). As does EnTech's expert report, which matches the components in the computer it analyzed—which Bryan attests is the computer that he recovered from Marcia's divorce counsel—

13

to those in a Micro Center receipt dated around the time that Bryan claims to have upgraded the EnTech Computer with Micro Center parts.   R. 54-7 (Vestige Report at 5) (Page ID #1010).

Marcia's next argument is that even if she was in possession of the EnTech Computer for some period of time, there is no evidence that she *herself* accessed it.   But EnTech presented evidence from which a reasonable juror could infer that Marcia in fact accessed the EnTech Computer and obtained information from it.   First, *someone* accessed the EnTech Computer to wipe its solid state drive, and as already explained a reasonable juror could find that Marcia had an opportunity to do so while she was in possession of the computer between May 30 and July 2, 2015.   Second, Marcia had a motive to access the EnTech Computer because EnTech's financials were at issue during the divorce, which she had filed for the day before moving out of the Speeces' Chagrin Falls home on May 30, 2015.   *See* R. 54-1 (B. Speece Aff. at ¶¶ 42–43, Ex. 13) (Page ID #820–21, 867–70).   Third, according to Janet's affidavit, Iain said that he took an EnTech business computer at his mother's behest.   *See* R. 54-4 (J. Speece Aff. at ¶ 22) (Page ID #959). A permissible inference to be drawn from this and Marcia's possible motive is that Marcia told Iain to take the EnTech Computer in order to access information stored on it that might prove useful in the divorce.   Fourth, Marcia's divorce counsel demonstrated at least some knowledge of confidential EnTech business information—such as the names of third parties doing business with EnTech, other information pertaining to those entities, and spreadsheets containing EnTech financial information—which would likely have come from Marcia.   *See* R. 54-1 (B. Speece Aff. at ¶¶ 43, 45–46) (Page ID #821–22); *see also* R. 54-6 (J. Heutsche Aff.) (Page ID #997–1000). Although Marcia may have obtained that information through her work as EnTech's bookkeeper,

14

it is also reasonable to infer, viewing the evidence in the light most favorable to EnTech, that Marcia took that information from the EnTech Computer while it was in her possession.[3]

In short, though largely circumstantial, EnTech's evidence is sufficient to survive summary judgment.[4] *See United States v. Teague*, 646 F.3d 1119, 1122 (8th Cir. 2011) (upholding a criminal CFAA conviction based on circumstantial evidence). There are genuine disputes of material fact as to the essential elements of a § 1030(a)(2)(C) claim, and these are for a jury to resolve, not the district court.[5]

## D. EnTech's State Law Claims

In addition to its CFAA claim, EnTech sought relief under state law, bringing claims for replevin, conversion, and civil conspiracy. R. 1 (Compl. ¶¶ 41–54) (Page ID #6–7). The district court, however, did not conduct an independent analysis of these claims, instead dispensing them out of hand after concluding that "[t]he complete lack of evidentiary support for the claim that Marcia Speece accessed the computer is fatal to all of EnTech's claims." *EnTech*, 2019 WL 6051531, at *3. On appeal, Marcia follows the district court's lead, dedicating a single paragraph to EnTech's state law claims. Marcia's arguments mirror those she presents regarding EnTech's CFAA claim, and they fail for the same reasons.

---

[3]According to Bryan, this information was not something to which Marcia would have been privy as EnTech's bookkeeper. *See* R. 54-1 (B. Speece Aff. at ¶ 23) (Page ID #814).

[4]In light of our conclusion that a reasonable juror could conclude that Marcia accessed the EnTech Computer and obtained information from it, we need not address EnTech's argument in the alternative that Marcia could be liable if it was Iain or her divorce counsel who accessed the EnTech Computer as co-conspirators.

[5]To the extent that EnTech's CFAA claim additionally invokes § 1030(a)(5), summary judgment would also be unwarranted on a claim brought under that provision. Claims brought under § 1030(a)(2)(C) and § 1030(a)(5) share similar elements except that § 1030(a)(5) establishes liability in cases where the unauthorized access of a protected computer causes damage—i.e., impairs the integrity of data, a program, a system, or information, *see* § 1030(e)(8)—without a requirement that the defendant obtained information.

15

***Replevin and Conversion.*** As to EnTech's replevin and conversion claims, Marcia predicated her summary judgment motion on the same theory that she raised as to EnTech's CFAA claim: that EnTech had failed to produce evidence to show that Marcia dispossessed EnTech of the EnTech Computer or ever had possession and control of it. R. 51 (S.J. Mot. at 6–7) (Page ID #772–73); *see Tewarson v. Simon*, 750 N.E.2d 176, 187 (Ohio Ct. App. 9th Dist. 2001) ("An action in replevin . . . lies only in behalf of one entitled to possession against one having, at the time the suit is begun, actual or constructive possession and control of the property.") (internal quotation marks omitted); *State Farm Mut. Auto. Ins. v. Adv. Impounding & Recovery Servs., Ltd.*, 848 N.E.2d 534, 537 (Ohio Ct. App. 10th Dist. 2006) (Conversion has "three basic elements: (1) a defendant's exercise of dominion or control (2) over a plaintiff's property (3) in a manner inconsistent with the plaintiff's rights of ownership."). As already explained, a reasonable juror could find that Marcia took the EnTech Computer with her on May 30, 2015, was in control of it for the next month or so, and then returned it with a missing rotating drive. Thus, as to EnTech's replevin claim there is a genuine dispute of material fact as to whether Marcia still had possession and control of the drive when EnTech filed suit. *See Tewarson*, 750 N.E.2d at 187. Likewise, as to EnTech's conversion claim, there is a genuine dispute of fact as to whether Marcia exercised dominion or control over EnTech's property in a manner inconsistent with its rights. *See Adv. Impounding & Recovery Servs., Ltd.*, 848 N.E.2d at 537.

***Civil Conspiracy.*** To succeed on its civil conspiracy claim, EnTech must prove "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987). In addition, liability for civil conspiracy would have to

16

be predicated on the completion of an underlying unlawful act.   *See Minarik v. Nagy*, 193 N.E.2d 280, 281 (Ohio Ct. App. 8th Dist. 1963).   Marcia sought summary judgment on EnTech's civil conspiracy claim, arguing that EnTech could not present evidence of (1) a "malicious combination" of two or more people or (2) an unlawful act.   R. 51 (S.J. Mot. at 7–8) (Page ID #773–74).

The "malicious combination" element "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act."   *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 9th Dist. 1996).   Janet's affidavit—which the district court disregarded as inadmissible hearsay in pertinent part—plainly evidences such a combination between at least Marcia and Iain.   *See id.* (Malice will be "inferred from or imputed to a common design by two or more persons to cause harm to another by means of an underlying tort, and need not be proven separately or expressly.").   According to Janet, Iain told her that Marcia told him to take the EnTech Computer, which Iain knew to be a business computer, and he complied by doing so when they moved out on May 30, 2015.   R. 54-4 (J. Speece Aff. at ¶ 22) (Page ID #959).   Other evidence corroborates the existence of this agreement between Marcia and Iain; for example, Marcia's return of what a reasonable juror could find to be the EnTech Computer, Bryan's attestations that he noticed the computer was gone "soon after" Marcia moved out, and Bryan's contemporaneous emails regarding the missing computer directed at Marcia and Iain.   R. 54-1 (B. Speece Aff. at ¶ 25, Exs. 10, 11) (Page ID #814, 861, 863).   Thus, a reasonable juror could find that Marcia was part of a malicious combination to injure EnTech. As for Marcia's second argument, our discussion to this point demonstrates that EnTech has

established a genuine dispute of material fact as to whether there has been a completed underlying unlawful act upon which to predicate civil conspiracy liability.

**\*\*\***

In sum, EnTech presented evidence sufficient to raise genuine disputes of material fact as to its CFAA, replevin, conversion, and civil conspiracy claims. Certainly, EnTech's evidence requires the indulgence of inferences that may or may not ultimately be warranted. Indeed, Marcia also raises legitimate doubts regarding at least Bryan's credibility. But in this posture, those inferences are to be indulged and those doubts are to be resolved in EnTech's favor as the non-moving party. *See Bard v. Brown County*, 970 F.3d 738, 759 (6th Cir. 2020). Viewing the facts in the light most favorable to EnTech, we conclude that its claims survive summary judgment.

### III. SANCTIONS

It follows from our conclusion that the district court erred in granting Marcia's motion for summary judgment that the district court also erred in imposing sanctions upon EnTech pursuant to Federal Rule of Civil Procedure 11. We review for an abuse of discretion a district court's decision to impose sanctions. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 409 (1990). "[T]he test for whether . . . sanctions are warranted is whether the conduct for which sanctions are sought was 'reasonable under the circumstances.'" *Salkil v. Mt. Sterling Twp. Police Dep't*, 458 F.3d 520, 528 (6th Cir. 2006) (quoting *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997)).

Here, the district court imposed sanctions on EnTech after concluding that it was unreasonable for EnTech to continue pursuing its case following the depositions of Marcia and Iain. *EnTech*, 2019 WL 6051531, at \*5. This decision was based on its earlier conclusion that

EnTech had not uncovered any competent or admissible evidence that Marcia herself had accessed the EnTech Computer. *Id.* at \*3–4. As explained above, this conclusion was incorrect, and thus the district court's imposition of sanctions falls with it. *See Salkil*, 458 F.3d at 527–28 ("A district court 'necessarily abuse[s] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" (quoting *Cooter & Gell*, 496 U.S. at 405)).

## IV.  CONCLUSION

For the foregoing reasons, we **REVERSE** the grant of summary judgment against and Rule 11 sanctions upon Plaintiff EnTech, LTD. We **REMAND** the case for further proceedings consistent with this opinion.